## PHILLIPS *v.* STATE.

### Opinion delivered February 29, 1896.

HOMICIDE—EVIDENCE.—On trial of a person for killing his wife, it was not error to admit evidence that, about two months before the killing, the defendant was seen whipping her, and that defendant had threatened to beat her to death if she would not stay at home.

SAME—EVIDENCE of the relations existing between defendant and his wife, with whose murder he was charged, and of bruises on her body exhibited within two months of the killing, are admissible to show the animus of defendant toward deceased.

EVIDENCE—PROOF OF INTENT.—On trial of one for killing his wife, a testamentary instrument executed by defendant on the day of the killing, and referring to the intended killing of his wife, is admissible to show his intent.

APPEAL—HARMLESS ERROR.—A conviction of murder will not be reversed because a motion for continuance made by defendant was taken by the jury to their consultation room, if such paper was taken from the jury immediately upon the court's being informed of the fact that it was there.

TRIAL—WHAT PAPERS JURY MAY TAKE.—A request by the jury to permit them to take a writing alleged to have been written by defendant, while they improperly had a motion for continuance by defendant, in order that they might compare the signatures on the two papers, was properly refused.

APPEAL—NECESSITY OF MOTION FOR NEW TRIAL.—Alleged error in refusing to discharge the jury, in the midst of their deliberations, on the ground that defendant had just learned that one of the jurors had been heard to say, in effect, that if he was on the jury he would hang defendant, will not be considered on appeal where it was not made a ground for new trial.

Appeal from Arkansas Circuit Court.

JAMES S. THOMAS, Judge.

*White & Streett* for appellant.

1.   The court erred in allowing irrelevant, improper, remote, and indefinite testimony to go to the jury, which was prejudicial.   45 Ark. 539; 52 *id.* 303.

2.   It was error to permit the jury to be in possession of the motion for a continuance, thus enabling them to compare the signatures to the motion and to the letter introduced in evidence.   29 Ark. 248.

3.   It was error not to discharge the jury on account of prejudice of the juror Bass; and also in refusing to allow defendant to prove the charges preferred against said juror.   The rule in 40 Ark. 51 does not apply here, as the objection was made before verdict.

*E. B. Kinsworthy*, Attorney General, for appellee.

1.   Testimony of Shelton and Hinson was admissible to show appellant's feeling toward his wife, and his animus toward her.   45 Ark. 539; 40 *id.* 511.

2.   The letter was admissible, as it shows that appellant had decided to kill his wife, and that he went to where she was to put his plan into execution.

3.   No harm was done by possession by the jury of the motion for continuance.   All the statements therein were favorable to appellant.   29 Ark. 248.

4.   The objection to the juror Bass came too late. 19 Ark. 156; 40 *id.* 515; Sand. & H. Dig. sec. 4259.

BUNN, C. J.   The appellant was indicted, tried and convicted in the Arkansas circuit court of the crime of

murder in the first degree, at its November term, 1895, and appealed to this court.

The testimony as to the facts and occurrences immediately connected with the homicide shows that the defendant, some time in the forenoon of the 29th day of June, 1891, in a field near the farm house of W. P. Porter, in Arkansas county, shot and killed Martha Phillips, his wife, in the manner and under the circumstances detailed by the witnesses present, as follows. Porter, the owner of the plantation, testified substantially as follows: "On the morning of the 29th day of June, 1891, I was engaged in mending a plow used by one of my hands on the farm, Joshua Fitzpatrick, by name, who was present; and while leaning over the plow, engaged in mending it, my attention was attracted by the defendant, Jordan Phillips, speaking and saying to his wife, who was twenty or thirty feet from him: 'Aren't you going home to take care of them children? Cut out!' And as I looked up, I saw defendant standing near me with a rifle in his hand. Defendant raised the gun and fired, and Martha Phillips fell. The defendant then stepped off a few yards, re-loaded his gun, and went off through the field in the direction of where his wife and Tom Pike, another hired hand of mine, had been working." Witness went up to Martha Phillips, and found her quivering and in the throes of death, and sent Fitzpatrick for Dr. Kelly, who came, but not before the woman had died, she having in fact died instantly, having been shot in the fleshy part of the left arm and into the left side.

Joshua Fitzpatrick testified, in substance, as follows, to-wit: He had broken his plow, and taken it to a point in the field near the house, and put up his team, and he and Mr. Porter were mending the plow. The deceased came up, and said to Mr. Porter, "Can Jordan [the defendant] make me go home?" And the defendant

then said to her, "You go home. Get out of here," and then fired, and deceased fell, and defendant, after reloading his gun, went off in the direction of where deceased and one Tom Pike had been at work. Witness was then sent for Dr. Kelly.

The defendant, testifying for himself, said, in substance, as to the occurrences: On the morning of the killing, his youngest child—an infant—had fits or spasms, and he started out again to get his wife to return home with him; went to the house of one of his sisters, and was there informed that his wife had hired to Mr. Porter, and was then working on his farm, to which place he then went, and as he passed along the road by the field he saw her and Tom Pike working together in the field, and, as he went towards them, deceased walked in the direction of Mr. Porter, and in that direction he went also, arriving there about the time his wife did. Defendant testified that he then said to her: "Mama, the baby is sick. Won't you go home and take care of it?" and that, in response to this, she said, "I told you last night I was not going home with you, and I will make Tom Pike kill you." Continuing, the defendant said: "The remembrance of the wrongs I had ever suffered at her hands came upon me at once, and in a fit of anger rendering my passions uncontrollable, I fired my gun and killed her. I brought my gun with me that morning, fearing I would meet Tom Pike, and that he would undertake to kill me, as my wife had threatened she would have him do." He further denied having written the testamentary letter.

These were all the witnesses who saw the killing, and all agree that defendant and his wife reached the fatal spot about the same time, and approached at right angles, and Porter says defendant could easily have shot deceased before reaching him. The testimony of defendant tended to show that the wrongs spoken of by him,

as suffered by him at his wife's hands, consisted of her desertion of him, leaving three little children, one an infant at the breast, for him to take care of, and (according to his own statement) living in adultery with Tom Pike, and heartlessly refusing to return home and care for the youngest child, even in its sickness. It will be seen that the manner ·in which defendant demeaned himself towards his wife at the fatal meeting was quite different according to his testimony and according to that of Porter and Fitzpatrick. The evidence shows that the relations between the defendant and his wife had been most unhappy for several months before the killing, and that she was not really living with him at the time of the killing, but had hired to Porter, to work on his farm for the time being, and that she and defendant had frequent separations before the killing.

The tenth, eleventh and twelfth grounds of motion for a new trial are merely formal. The first, second, third, fourth, eighth, and ninth grounds are to the effect (first and second) that the testimony of A. H. Shelton; (third and fourth) that the testimony of W. W. Hinson; and (eighth and ninth) that the testimony of Buck Butterworth was inadmissible because the same is irrelevant, improper, too remote, indefinite, and otherwise objectionable. The testimony of Shelton was to the effect that, about six weeks or two months next before the killing, he saw defendant whipping his wife with a strap, in his (defendant's) front yard, having her tied to a tree for that purpose; that before that he heard defendant making threats that he would beat his wife to death, since she would not stay at home, and if she would not stay at home, and, at the time of the whipping, defendant told witness he whipped her because she would not stay at home. Witness said further that Martha Phillips was, at the time of the

*Admissibility of evidence in homicide cases.*

whipping, living with defendant. The testimony of Hinson was to the effect that he lived about a mile from defendant's place; that, about two months before the killing, defendant and his wife came to his (witness') house, and while there, but not in the hearing of his wife, defendant said to witness that, if he (witness) would withdraw his support from his wife, he would make her go home with him; and that he (witness) told him that the law did not give him any such right. Witness further stated that, about six weeks or two months before the killing, the deceased had exhibited to him certain bruises on her arms and body, and related her statements in regard thereto, but on motion of defendant all her statements were excluded. Witness, further testifying, described the character of the bruises, and then said, also, that he had written a contract in the spring of 1891 between defendant and Amanda Phillips (who testified that she was a former wife of defendant) for the purpose of preventing them being prosecuted for living together as husband and wife. The testimony of Buck Butterworth is to the effect that defendant told him, about one month before the killing, that he would make his wife come back home to him, or beat her to death. We do not think that any of this testimony is irrelevant, improper, too remote, or indefinite. It all tends to show the relations existing between defendant and deceased during the period covered by it, and also the animus of defendant towards the deceased. We do not think it is improper, and certainly not indefinite. It is not too remote, for it relates to matters occurring or existing not exceeding two months before the killing, and from that on down to the killing. When taken in connection with the testimony of defendant himself, and others, and viewed in the light of surrounding circumstances, all this testimony goes to show the intent with which the homicide was committed. In *Carroll* v. *State,*

45 Ark. 539, (quoting from the syllabus), this court, in effect, said: "On the trial of a party for the murder of the wife, evidence of his recent acts of personal violence upon her, coupled with oaths, is admissible to show the state of his feelings towards her and the manner in which they lived."

Equally untenable is the defendant's fifth objec- *Admissibility of evidence to show intent.* tion, to the effect that the court below erred in admitting in evidence the paper in the nature of a testamentary disposition of defendant's worldly goods, purporting to have been written the day of the killing, proved to have been in the handwriting of the defendant, and found the day after the killing, in his house, by the posse who were in close pursuit of him. This paper contained a reference to the intended killing of his wife, and threw light on his intent, unquestionably.

The sixth objection is that, by inadvertence or *When taking of papers by jury is not prejudicial.* otherwise, a paper (a motion by the defendant in the case, a long time before, for a continuance for the absence of a witness, and reciting what he could prove by her if present), had got into the hands of the jury, and was in their possession in their consultation room, and that this was error. That is true; but, immediately on the court being informed of the inadvertence, by its order the paper was taken from the jury. That they should have had possession of it was, of course, improper, but not reversible error. *Palmore* v. *State*, 29 Ark. 248.

The thirteenth objection is to the effect that the *What papers the jury may not take.* court erred in denying the request of the jury to permit them to have the testamentary letter while they had the motion for continuance, so that they could compare the handwriting and signature of the former with the signature of the latter. The possession of the motion for continuance by the jury was admittedly improper, and certainly that impropriety could not have been remedied

. by giving the jury the other paper for the purpose of comparison.

The seventh objection is that the court refused to discharge the jury in the midst of their deliberations on the case, on motion of defendant, because, as he said, and offered then and there to show, one Bass, a member of the jury, before being selected as such, had been heard to say, in effect, that defendant ought to be hung, and that if he was on the jury he would hang him, and all this the defendant had only heard at the time of making the motion. Whatever there might have been in this motion, it should have been renewed as part of the motion for new trial, and the offer to make proof also renewed, as a ground to set aside the verdict. Only the fact of the motion having been made and overruled before verdict is embodied in the motion for a new trial. The statute is certainly not favorable to this contention. Sand. & H. Dig. sec. 4259. Nor are the decisions of this court. *Meyer* v. *State*, 19 Ark. 156; *Casat* v. *State*, 40 Ark. 511.

Upon the whole case, since the evidence clearly sustains the charge, we see no reversible error, and the judgment will therefore be affirmed.