OWENS *v.* STATE.

Opinion delivered October 25, 1915.

1. HOMICIDE—PROOF—SUFFICIENCY.—In a prosecution for homicide, where there were no witnesses to the crime, the evidence held sufficient to warrant a conviction of first degree murder.

2. CONTINUANCES—ABSENCE OF WITNESS—CUMULATIVE TESTIMONY.—In a criminal trial, it is not error to refuse a continuance on account of the absence of a witness, where the testimony of that witness would have been purely cumulative, and the same testimony by other witnesses could be easily procured.

3. EVIDENCE—FOOT-PRINTS—MEASUREMENT — SHOES. — Foot-prints were found near the scene of a killing. *Held,* it was proper for the court to permit the shoe dealer from whom the accused had purchased a

pair of shoes a few days before the killing, to testify to a comparison made by him between the foot-prints and a pair of shoes of the same make as those purchased by defendant, being the same width, but a half size shorter in length.

4.  CRIMINAL LAW—EVIDENCE—CONFESSION—CORPUS DELICTI.—In a prosecution for homicide, when the *corpus delicti* is established by undisputed evidence, *held*, evidence of a confession, if believed by the jury, is sufficient to sustain a conviction, and under such circumstances the trial court is not, required to instruct upon the weight of the testimony concerning the confession.

5.  TRIAL—OPENING STATEMENT—FAILURE TO PROVE FACTS THERE STATED. —If a prosecuting attorney makes reckless statements in bad faith, in his opening statement, it is the duty of the court, by proper admonition and by punishment if need be, to stop such practice, but merely because the prosecuting attorney has said in his opening statement to the jury that he will prove things which subsequently he is unable to do, does not afford any grounds for reversal.

6.  TRIAL—CRIMINAL CASE—ARGUMENT OF COUNSEL.—Where, in a prosecution for homicide, it appeared from the evidence that one P. was with the defendant on the night of the killing, and was with him also early the next morning, these facts held to justify the argument by the prosecuting attorney that the killing was done by the two men.

Appeal from White Circuit Court; *J. M. Jackson,* Judge; affirmed.

*W. D. Davenport* and *Harry Neelly,* for appellant.

The court erred in overruling appellant's motion for a continuance, he having used all due diligence to procure the attendance of the absent witness.   100 Ark. 310; 99 Ark. 394; 99 Ark. 547; 60 Ark. 565.

The evidence is not sufficient to support the verdict of the jury.   34 Ark. 632; 13 Ark. 712; 16 Ark. 499; 34 Ark. 720.

The remarks of the prosecuting attorney were highly improper and prejudicial.   84 Ark. 134; 74 Ark. 256; 58 Ark. 473; 61 Ark. 130-138; 70 Ark. 305-307.

The court erred in not admonishing the prosecuting attorney as to his improper remarks.   70 Ark. 305; 67 S. W. 755; 72 Ark. 427; 74 Ark. 256; 85 S. W. 428; 74 Ark. 298; 85 S. W. 771; 116 Ark. 514; 110 Ark. 538.

*Wallace Davis,* Attorney General and *Jno. P. Streepey,* Assistant, for appellee.

The motion for continuance was properly overruled, as the testimony of the absent witness, if produced, would have been merely cumulative. 86 Ark. 317; 100 Ark. 149; 103 Ark. 119.

The appellant did not show due diligence. 94 Ark. 169; 92 Ark. 28; 100 Ark. 132.

The testimony of witness Barnard, to the effect that appellant had confessed to him that he had killed the deceased was proper to go to the jury. 94 Ark. 343, 344; and the court did not err in modifying instruction No. 7. 94 Ark. 343, 344; 72 Ark. 126; 73 Ark. 407.

The prosecuting attorney did not commit any error in his opening statement, nor in the argument.

There was evidence upon which to base the verdict. 109 Ark. 130; 109 Ark. 138.

McCulloch, C. J. Appellant was convicted of the crime of murder in the first degree, and his punishment was fixed by the jury at life imprisonment. The charge against him is that he and one John Perdue committed the offense by killing Luther Cotham at the village or town of Georgetown, White County, Arkansas, on the night of April 27, 1915.

The principal ground urged for a reversal of the judgment is that the evidence is not sufficient to sustain the verdict, and in disposing of that contention it is necessary to discuss in detail the circumstances of the killing and the facts and circumstances which tended to establish appellant's guilt.

Appellant lived at Georgetown in the house with deceased and the latter's wife. He had been living at Georgetown about a year, and lived in the house with deceased and his wife since the month of December preceding the killing. Deceased and his wife lived in a room downstairs, and appellant occupied a room upstairs, which was approached by a stairway leading up to the front porch. Appellant paid no board, but was living there at the request of the deceased. The killing occurred

on Saturday night, and a few days before that deceased and his wife had decided to leave there, and had spoken to appellant about the fact that they were going to leave. Shortly before that time appellant had made a proposal to the wife of deceased that she leave her husband and go away with him, but she declined to accept the invitation. About supper time on the night of the killing deceased and his wife were absent from the house, and on their return they found appellant in their room with the door locked. A few days before that time Mrs. Cotham tried to get appellant to quit staying at the house, but, according to her testimony, he declined to do so. Mrs. Cotham's father also testified that he talked to appellant and tried to get him to leave, and suggested that he was causing trouble between Cotham and his wife, but that appellant declined to go, saying that he had talked to Cotham, and that the latter had consented for him to stay. Mrs. Cotham also testified that about a week before the death of her husband appellant said to her that he had eavedropped her and her husband and watched them through the window, and that he said "he had a damn good notion of taking his gun out of his pocket and killing both of them."

There was a negro dance in Georgetown on the night of the killing at the house of a negro named McRae, and early in the evening appellant left the house of the Cothams and went to the dance. He invited Cotham to go with him, and the latter declined to go at that time, but about an hour later followed, and both of the men attended the dance. Appellant and Cotham were both white men. Witnesses testified that Cotham left the dance about 11 or 12 o'clock, and appellant himself testified the last time he saw Cotham the latter was standing out to one side talking with several negro girls. The killing occurred some time during the night, but there is no direct testimony as to the hour it occurred. The proof adduced by the State shows that the watch of deceased stopped at 1 o'clock, and the inference is that the killing occurred at that hour. Several of the witnesses testified

about the condition of Cotham's body when found the next day, but there is no witness that states where the body was found, though it is fairly inferable from the testimony that the body was found in White river. Georgetown is situated on or near the bank of that stream. The witnesses who testified concerning the condition of the body stated that the left side of the face was crushed and mutilated, and that there were three knife wounds in the abdomen. The place of the killing was identified by several witnesses who testified that they found tracks and blood and followed them to the bank of the river where the body was evidently thrown in. There was also found at the place thought to have been the scene of the killing three human teeth and a pistol cartridge, and also a fresh cork which came out of a bottle of whiskey. The indications were that some person had carried the dead body of Cotham from the place that the witnesses identified as the place of the killing, to the river, and that the body was laid down on the ground at different places, the places being indicated by blood spots.

About 5 o'clock the next morning appellant and Perdue went to a drug store in Georgetown and awakened Doctor Alexander, the proprietor, and appellant asked for some medicine to be administered to Perdue, who was sick and suffering from stomach trouble. Perdue testified that he became grossly intoxicated the night before and slept most of the night and awoke early in the morning very sick. Appellant admitted that he and Perdue had been together all night—that he had remained with Perdue during the part of the night that the latter lay in a drunken sleep. Doctor Alexander administered the medicine and appellant laid down on a bed in the back room of the drug store and slept until about 8 o'clock. He had a small suitcase with him, and he placed that under the bed. An officer sent to Brinkley for bloodhounds, which were brought to the scene of the killing by the owner, who testified as to the qualifications of the dogs to follow a human trail. There was one track in

particular that was plainer than the others, and when discovered early Sunday morning, a pig-pen was moved over it so as to fence it away from intruders. Appellant had bought a pair of shoes from a merchant at Georgetown about a week before the date of the killing, and the merchant testified that the shoes were No. 9 in size, and they took a No. 8½ shoe of the same make, and the same width last, and put it in the track, and the shoe fit the track except in length. The bloodhounds were taken to this track and they began following a trail toward the river, and thence to a sawmill, and thence around the railroad station, and thence to the drug store, and through the store back into the sleeping room, where one of the dogs mounted the bed where appellant had slept that morning, and the other dog went under the bed and could hardly be forced away from appellant's suitcase which was lying under the bed. The suitcase, when opened, was found to contain some of appellant's clothing and three bottles of whiskey.

Appellant was arrested by the officers at 6:20 o'clock in the evening while at the railroad station just as the train came in. The dogs were following the trail at that time, and, according to the witnesses, every man about the town except the railroad agent and appellant were following and watching the movements of the dogs. Several witnesses testified that during the forenoon of that day they noticed appellant with the left sleeve of his undershirt rolled up, and that there was blood on the sleeve. They testified that on the upper side there appeared to be a clot of blood, and on the lower side of the sleeve there was a smear of blood as if the sleeve had been rubbed against some bloody place. A physician, who qualified himself as a chemist, testified that he had made an examination and chemical analysis of splotches on a pair of pantaloons which appellant wore on the day after the killing, and that he found the splotches were caused by blood, but he could not say whether it was human blood, or that of some other animal.

After the examining trial, appellant was incarcerated in the county jail of White County, where he remained until the time of this trial, which began on July 27, 1915. One Britt Barnard, who was also a prisoner in the jail under a charge of bribery, testified that he had been acquainted with appellant at Georgetown, and that after the latter was placed in jail, he confessed to witness that he had killed Luther Cotham, and threw his body in the river, and that he committed the deed on account of Cotham's wife. There are, perhaps, some other circumstances of less importance than those just enumerated, pointing with some force toward the guilt of the accused.

(1)   We are of the opinion that the evidence is sufficient to sustain the verdict. The *corpus delicti* was established by abundant testimony, and the confession made to Barnard constituted evidence legally sufficient to support the verdict. In addition to that, there are many circumstances already referred to which tend to show that appellant was the guilty party. There is a sharp conflict, however, in the testimony bearing upon each of the circumstances just related. Appellant denies that he made any improper proposals to Cotham's wife, and denies any participation in the commission of the crime, or any knowledge of it. He stated that he went to the negro dance that night and remained there all night. He introduced other witnesses whose testimony tended to corroborate his own to the effect that he remained at the dance after Cotham left there about midnight, and that he remained there all night until he went to Doctor Alexander's drug store the next morning. He denies that there was any blood upon his clothes, except a small spot of blood on his trousers which he got there when he assisted Cotham in marking a hog about a week before the killing occurred. The state of the testimony made a case for the jury, and there was sufficient to warrant the jury in reaching the conclusion beyond a reasonable doubt of appellant's guilt of the crime.

(2)   It is insisted that the court erred in overruling appellant's motion for a postponement of the trial until

a later day of the term. The postponement was sought to enable appellant to procure the testimony of one Lefty Sharp, who, according to the recitals of the motion, would testify that he was at the dance all night and played the piano for the dancers, and that he was in company with appellant and knew that he did not leave the dance that night. Appellant caused a subpoena to be issued for Sharp, but the sheriff in his return showed that the witness could not be found in that county. Witnesses were heard by the court upon that issue, and it appears therefrom that Sharp's people lived at Kensett, White County, but he was a strolling musician and the last heard of him he was traveling with a minstrel show. One witness testified that about a week before the trial began he heard of Sharp being at Brinkley, Arkansas, and the deputy sheriff who tried to serve the subpoena testified that he received information that the witness Sharp was in Madison, Arkansas. It does not appear with any degree of certainty that the attendance of the witness could have been procured, and we can not say that the court abused its discretion in refusing to postpone the trial. In addition to that, it appears that the testimony of the witness, if his attendance could have been procured, would have been to the effect that he was at the dance all night with appellant. Other witnesses testified to the same facts, and there were numerous other persons at the dance whose attendance at the trial could have been procured. The testimony of Sharp was, in other words, purely cumulative, and it was not an abuse of the discretion of the trial court to refuse to postpone the trial to enable appellant to get the testimony of that particular witness when the same testimony of other witnesses could easily be obtained.

(3) The next ground urged for a reversal is that the court erred in permitting witnesses to testify concerning the comparison of the shoe procured from the merchant, with the track found at the scene of the killing. It will be remembered that the shoe compared with the track was not of the same size as that purchased from the merchant by appellant and worn by him, but the merchant

testified that it was the same kind of a shoe and made on the same last, the only difference being that the shoe with which the comparison was made was a half number smaller than the shoe sold to appellant. We are of the opinion that the conditions were so near the same in substance that the testimony was admissible, it being a question for the jury to determine from the description given by the witnesses as to the comparison, whether or not appellant's foot made the track. *St. Louis, I. M. & S. Ry. Co.* v. *McMichael,* 115 Ark. 101, 171 S. W. 115. It is true the shoes were of different sizes, but the witnesses said when they placed the shoe in the track they were the same size except in length and they undertook to state the difference in length. Appellant had, according to the testimony of the merchant, purchased the pair of shoes just a few days before the killing occurred, and that it was too short a time for the shoes to become considerably worn.

(4) Another assignment of error concerns the court's modification of instruction No. 7, requested by appellant. In that instruction the court was asked to tell the jury "that the alleged confession of the defendant should be received with great caution and carefully weighed, and if the evidence against the defendant consists of his confession, unsupported by other evidence, the jury will find the defendant not guilty." The court struck out that language, but instructed the jury "that the alleged confession of the defendant should be considered by you along with the other evidence in the case, and if the evidence against the defendant consists of his confession, unsupported by other evidence, the jury will find the defendant not guilty." The instruction requested by appellant was upon the weight of the evidence, and the language used was properly stricken out. The court told the jury that the unsupported testimony of the confession was not sufficient, and that was as much as appellant was entitled to on that subject. The *corpus delicti* was established by undisputed evidence, and the testimony as to the confession, if believed, was sufficient to sustain the

conviction. It was not error for the court to refuse to instruct upon the weight of the testimony concerning the confession.

(5)   The only remaining assignment relates to alleged misconduct of the prosecuting attorney in his opening statement to the jury, and in his closing argument. It is claimed that the statements of the prosecuting attorney in his opening argument should have been excluded for the reason that there was no testimony to support it, and that some of the statements were incompetent even if there was testimony upon which to base them. We have carefully considered these assignments and conclude that there was nothing in the statements that was calculated to operate to appellant's prejudice. There was no request made for an instruction telling the jury that they should not consider the statements of the prosecuting attorney which were not subsequently borne out by the testimony adduced in the case, and the presumption should be indulged that the jury tried the case upon the testimony of the witnesses, and not upon the unsupported statements of the prosecuting attorney made in his opening argument. The prosecuting attorney may not always be able to make the proof that he anticipates, and the judgments of conviction should not be set aside merely because that officer makes a mistake. If reckless statements are made by a prosecuting attorney not in good faith, it is the duty of the court, by proper admonition and by punishment if need be, to stop such practice, but merely because the prosecuting attorney has said in his opening statement to the jury that he will prove things which subsequently he is unable to do, does not afford any grounds for reversal.

(6)   There is one statement in the closing argument of the prosecuting attorney which is called to our attention as prejudicial error, and to which the appellant saved his exceptions. That statement amounted to a comment on the failure of appellant to produce other witnesses except Perdue, and (quoting from the remarks), "the one that stood by and saw him strike the fatal

blow." Also to the further comment of the prosecuting attorney on the character of Perdue, who was spoken of as "one of the murderers." It is urged that there is no evidence tending to show that Perdue participated in the crime, and that for that reason the statement was unsupported by the evidence. It was, we think, legitimate for the prosecuting attorney to draw the inference that Perdue was a participant in the crime. It may be that the testimony is insufficient to make out a case against Perdue, but the fact that he was, as shown by some of the evidence, in the company of appellant during the night, and went with him to Alexander's drug store early the next morning, justified the argument that the crime was committed by those two men.

Upon the whole we find no prejudicial error in this record, and, the testimony being legally sufficient to sustain the verdict, the judgment is affirmed.