## LEWIS *v.* STATE.

### Opinion delivered October 16, 1922.

1. HOMICIDE—CONCLUSIVENESS OF VERDICT.—In a prosecution for murder, where the issue whether defendant was guilty of voluntary manslaughter under the evidence was one of fact, the verdict of the jury is conclusive.

2. CRIMINAL LAW—EXCUSING JUROR—HARMLESS ERROR.—In a criminal prosecution where the jury panel was completed before defendant exhausted his peremptory challenges, and the court excused a juror who testified that he could try the case solely according to the law and evidence, but that he was an intimate friend of defendant and might be biased in his favor, it cannot be contended that a biased or incompetent juror was forced upon defendant.

3. HOMICIDE—THREATS BY DEFENDANT.—In a prosecution for murder, admission of evidence of threats made by defendant within the preceding year against deceased was not error.

4. HOMICIDE—THREATS OF DEFENDANT.—In a prosecution for murder, it was competent to prove that defendant had stated that he was going to send deceased to the penitentiary as a bootlegger and moonshiner, or that he would like to see him go to the penitentiary.

5. HOMICIDE—THREATS.—In a prosecution for murder where there was evidence of threats by defendant to deceased as to what he would do if deceased trespassed on his land, it was not error to permit evidence that defendant nailed a notice on a tree that trespassers would be dealt with right on the spot.

6. WITNESSES—CROSS-EXAMINATION OF ACCUSED.—In a prosecution for murder, it was not error to permit defendant to be cross-examined as to whether he had not bought whiskey from a certain person, and furnished him money to operate a still.

7. HOMICIDE—THREATS BY DECEASED.—In a prosecution for murder it was not error to reject evidence of a threat by deceased, as follows: "If I ever catch him just right, I am going to give

him a good clouting," where the witness understood that deceased referred to defendant, but would not swear that he was talking about defendant.

8. CRIMINAL LAW—NECESSITY OF SPECIFIC OBJECTION.—An instruction which, after defining manslaughter, stated that "unless it appears from the evidence that there was a provocation sufficient to make passion irresistible," the crime would not be reduced from murder to manslaughter, was not open to a general objection, as the omission of the word "apparently" before the word "sufficient" should have been called to the court's attention specifically.

9. CRIMINAL LAW—INSTRUCTIONS CONSTRUED AS A WHOLE.—In a murder trial, an instruction that if deceased assaulted defendant, but there was no cause for defendant to believe that he was in any danger of being killed or seriously injured, but defendant, because of ill feeling or malice, and not an honest effort to protect himself, killed deceased, he would be guilty of murder in the second degree, was not objectionable as excluding from the jury any state of facts which may have seemed to defendant to be true when taken in connection with other instructions.

10. CRIMINAL LAW—FAILURE TO INSTRUCT AS TO LOWER DEGREE OF HOMICIDE.—In a prosecution for murder, the court's failure to charge on the difference between voluntary and involuntary manslaughter was not error where no request therefor was made, and where an instruction as to involuntary manslaughter would have been abstract.

11. CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—Refusal of a prayer for instruction partly incorrect was not error, especially where the correct portion was covered by instructions given.

12. HOMICIDE—NEWLY DISCOVERED EVIDENCE.—Where defendant was convicted of voluntary manslaughter, and one of the grounds for new trial was newly discovered evidence that hatred existed between deceased and defendant, and that deceased intended to kill defendant, it was not error to refuse a new trial, if the court might have found that this evidence could have been produced at the trial.

Appeal from Garland Circuit Court; *Scott Wood,* Judge; affirmed.

*Martin, Wootton & Martin,* for appellant.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *Wm. T. Hammock,* Assistants, for appellee.

Wood, J. The appellant was indicted by the grand jury of Garland County of the crime of murder in the

first degree in the killing of one Tom Fielder. He was tried, and, from a judgment of conviction for voluntary manslaughter and sentence fixing his punishment at six years' imprisonment in the State Penitentiary, he duly prosecutes this appeal.

1. The testimony for the State, giving it its strongest probative force in favor of the verdict, tended to prove substantially the following facts: During the month of October, 1921, John Lewis (hereafter called appellant) at about the hour of 12:30 was in the wagon yard of one Fulfer, in the city of Hot Springs, Garland County, Arkansas, negotiating with Fulfer for the purchase of a shotgun. A few minutes after appellant went into the wagon yard, one Fielder (hereafter called deceased) walked in. The deceased walked up to where appellant and Fulfer were standing. Two other gentlemen were standing off to one side, and the deceased said to them, ''I want you two gentlemen to walk up here and hear what I have to say to this man.'' They stepped up within something like six or eight feet of the deceased and the deceased then said: ''What have I ever said or done that you are telling my neighbors that you are going to put me behind the walls?'' and appellant said, ''If I knew enough, or I know enough, I will damn sure put you there.'' When appellant said that deceased made a grab at appellant's arms and caught him by one of them. Appellant jumped back and turned around—''sort of turned his back'' to deceased—and deceased still held to appellant. After deceased grabbed the appellant, the latter drew his gun and shot right under deceased's left arm. After the first shot they went about ten or twelve feet backwards—sort of turned as they went. Then appellant fired the second time. When the second shot was fired deceased had hold of appellant's arm—the arm in which he held the gun—and was pushing the arm back. Appellant pushed this arm around under the deceased's side and shot the second time. When appellant pulled the trigger the gun was right up against deceased's body.

As appellant brought his arm around the deceased's body Fulfer hollered at appellant "Don't do that," but the appellant shot the deceased. After the deceased was shot appellant said to him, "Tom, turn me loose," and the deceased replied, "I will when I am dead." These remarks were made just before appellant shoved the deceased loose from him. The deceased spoke no more, and expired in a short time thereafter.

The deceased was about fifty years old and weighed between 150 and 160 pounds. The appellant was thirty-four years old and weighed about 200 pounds.

There was testimony for the State tending to show that the deceased had incurred the ill-will of appellant about a year before the killing, which continued down to the time thereof. That was evidenced by certain threats and remarks in the nature of threats made by the appellant concerning the deceased, which we will refer to later.

The testimony for the appellant tended to prove that while he and Fulfer were talking about the sale of the shotgun the deceased walked up and said he wanted to know why appellant had been talking about him. He then called to men standing by to walk up and hear what he had to say to appellant. Appellant asked the deceased what he had said and deceased replied, "You said you know enough to put me behind the bars." Appellant replied "I don't want to have any trouble with you." Deceased then walked up closer to appellant and repeated what he had said. Appellant replied, "You know what I know about you; I have got to go to Little Rock as a witness and if I am asked I will tell the truth about what I know." Deceased was then five or six feet away from the appellant, and appellant turned away from him, and as he did so, deceased struck appellant a lick, staggering him back some four or five feet. Before appellant straightened deceased grabbed him over the right shoulder and struck him four to six times. Appellant could not tell what the deceased was striking him with, but deceased struck him twice in the same place. Appellant tried to pull loose,

and they went something like fifteen feet. After deceased struck appellant the latter pulled his gun out of his pocket and fired. He did not shoot at deceased that time, but told deceased two or three times to turn him loose. Appellant thought after he fired the first shot that deceased would turn him loose, but deceased held on to appellant. Appellant pulled deceased almost back to the end of the wagon yard, going as far as he could, then came back the same way ten or fifteen feet. They must have gone fifty or sixty feet altogether. Then appellant fired the second time.

The appellant testified that after he had tried to get away every way he could, the thought struck him that deceased wanted to prevent appellant from telling what he knew about the whiskey business. The wagon yard, where the shooting occurred, had the reputation of being "a sort of headquarters for the bootleggers." Appellant had seen a load of whiskey started to that yard one time that belonged to a man who helped run the yard. The testimony of the appellant tended to prove that in June previous to the killing a horse had run away with him and he had broken his arm; that he had not had much use of that arm since, and that at the time of the encounter he was not able to do any hard physical work. Appellant had ascertained that the deceased was in the whiskey business before the deceased moved from the country to Hot Springs. There was testimony that when he was killed, deceased had on his person a beer bottle about one-third full of corn whiskey; that he was a powerful man physically, and had the reputation of being quarrelsome and overbearing. There was testimony for the State in rebuttal tending to prove that the deceased had the reputation of being a man of peace and quietude. The above is substantially the testimony for the State and the appellant upon which the verdict was rendered.

The appellant contends that the evidence was not sufficient to sustain the verdict and that this court should so declare as a matter of law, but we are convinced that the

issue as to whether or not appellant was guilty of the crime of which he was convicted was one of fact and not of law. The verdict of the jury is conclusive on this issue of fact.

2. Jesse Rowe, one of the regular panel of the petit jury, on his *voir dire* examination, stated that, while he had formed and expressed an opinion as to the guilt or innocence of the defendant from reading the newspapers, yet he could discard such opinion and try the case solely according to the law and the evidence. He further stated that he had been an intimate friend of the appellant for a number of years, and that for that reason he might possibly be biased in appellant's favor. The court excused him from service on the jury for cause.

Appellant contends this was reversible error. The record shows that out of the regular panel the court excused nine for cause. Four were peremptorily challenged by the State, and seven were challenged by the appellant: Four were accepted by the parties. The regular panel being then exhausted, the court ordered a special venire of fifty names to be drawn from the names of the talesmen who were selected by the jury commissioners. Of these, ten were excused by the court for cause, seven were peremptorily challenged by the appellant, and eight were accepted by the parties, which completed the trial panel.

It thus appears that appellant exhausted only fourteen of the twenty peremptory challenges allowed him by law. Appellant therefore does not show that any incompetent juror was thrust upon him. In *Decker v. Laws,* 74 Ark. 286, we said: "But, since appellants were not entitled to have any particular juror, the erroneous rejection of the talesman was not prejudicial, in the absence of a showing that some biased or incompetent juror was thrust upon them. *Vaughan v. State,* 58 Ark. 353."

3. The State was permitted to prove, over the objection of the appellant, that in the spring of 1921 the appellant, in speaking of the deceased and Wash Lewis, the brother of appellant, said, "Well, by G——, I ought to

go and have them arrested. No, I just ought to take my gun and go and kill them like damn dogs.'' The witness was further permitted to testify that when appellant met the deceased and Wash Lewis he also said to the deceased, ''Mr. Fielder, by G——, I don't want no trespassing or anything like that on my land. You be sure and keep the road.'' On this occasion appellant followed deceased 12 or 15 steps with his shotgun. Deceased replied to appellant, ''Now, John, we don't want no trouble.'' Witness further testified that appellant nailed a notice up on a tree, which, according to witness' recollection, read as follows: ''No trespassing, in no way regardless, or any one will be dealt with right on the spot.''

A witness, over the objection of the appellant, was also permitted to testify that, in a conversation about six months prior to the killing, appellant stated that he was going to send Wash Lewis and Tom Fielder to the penitentiary, and the court refused to permit the appellant, on cross-examination, to elicit from this witness the fact that the deceased was a bootlegger and moonshiner. Over the objection of appellant, the court permitted another witness to testify that he heard appellant say that there were only two men he would like to see go to the penitentiary and they were the deceased and Wash Lewis. The court also, over the objection of appellant, permitted Wash Lewis to testify that appellant tacked a notice on a tree, which notice contained the numbers of the land on which it was posted, and stated that anybody trespassing or coming over the line would be dealt with on the spot. The court, also over the objection of appellant, permitted the prosecuting attorney to ask appellant on cross-examination whether or not he had bought whiskey from one George Mulhollan, and also whether or not he had furnished Mulhollan money to put up and operate his distillery.

The appellant duly saved his exceptions to the rulings of the court above mentioned and preserved his ex-

ceptions in his motion for a new trial. There was no reversible error in any of the above rulings.

In *McIlroy* v. *State,* 100 Ark. 301-311, we said: "Testimony of threats made by the defendant against the deceased prior to the homicide are admitted for two purposes: They are admissible for the purpose of throwing light upon the defendant's motives, and in proof of malice and premeditation on the part of the defendant. * * * When other facts and circumstances have been adduced in evidence connecting the defendant with the commission of the crime, then threats made by him against the deceased prior to the homicide become links in the chain of evidence showing his guilt."

Now, there was testimony tending to prove that the ill-will and hostility which existed between the appellant and the deceased had not abated, but had continued down to the time of the killing. Of course, the direct threats and the declarations in the nature of threats, under the rule announced above, were admissible. "Every declaration," says Mr. Wharton, "which indicates, however vaguely and indefinitely, an intention upon the part of the person making it to inflict violence upon another is a threat within the meaning of these rules; and a threat to prosecute for a violation of law has been held to be an admissible threat. * * * So, language used by the accused against the deceased expressing hostility and dislike is admissible in a prosecution against him for killing the deceased, though it did not amount to threats." Wharton on Homicide, § 602, p. 934. Under the above rule the testimony in regard to sending the deceased to the penitentiary and to the effect that appellant would like to see the deceased go to the penitentiary was relevant and therefore admissible. The testimony concerning the posting of the notice could not have prejudiced the rights of appellant, in view of the proof of direct threats.

The court did not err in permitting the prosecuting attorney, on cross-examination of the appellant, to ask him whether or not he had bought whiskey from one

Mulhollan and whether or not he had furnished Mulhollan with money to buy and operate a distillery. "The accused in a criminal case may, for the purpose of testing his credibility, be questioned on cross-examination as to his having been a gambler, and as to other offenses and immorality." Second syllabus, *Shinn* v. *State,* 150 Ark. 215, and cases there cited. When the appellant took the witness stand in his own behalf, he became subject to the above rule.

4. Appellant offered to prove by witness E. E. Burke that at the home of appellant the summer before the killing he heard the deceased and the wife of appellant talking, and deceased said, "If I ever catch him just right, I am going to give him a good clouting." Witness understood that the deceased was talking about the appellant, although he would not swear that he heard him mention appellant's name. Witness stated that the deceased did not call appellant's name directly but that it was understood that deceased was talking about the bunch of people. It was witness' understanding that deceased was talking about the appellant. It will be observed that the witness would not swear that the deceased was talking about the appellant. Therefore, the court did not err in rejecting the testimony. *Deal* v. *State,* 82 Ark. 58; *Hobbs* v. *State,* 86 Ark. 360.

5. In instruction No. 8 the court, after correctly defining manslaughter in the language of the statute, told the jury in the concluding portion of the instruction that "unless it appears from the evidence that there was a provocation sufficient to make the passion irresistible" the crime could not be reduced from murder to manslaughter. The appellant urges that this instruction was erroneous because it omitted the word "apparently" before the word "sufficient" in the portion above quoted. There was no specific objection to the instruction, and when the first part of the instruction correctly defining voluntary manslaughter is read in connection with the concluding portion quoted, it is clear that the instruction

was not inherently erroneous. The appellant therefore should have called attention to the incorrect phraseology of the concluding portion quoted by specific objection. The same likewise applies to instruction No. 11\*, of which the appellant here complains. *Guerin v. State, ante* 50.

The appellant objected to the ruling of the court in giving instruction No. 9† on the ground that it excluded from the consideration of the jury any state of facts that may have seemed to the appellant to be true. The instruction, taken in connection with the other instructions, could not have misled the jury.

The appellant objects to instruction No. 13, his objection being that the instruction was abstract, but we do not so regard it. It is unnecessary to set the instruction forth at length. It correctly declares the law relating to self-defense and manslaughter in conformity with many rulings of the court on that subject, and is not abstract.

The appellant also urges that the court erred in failing to instruct the jury explaining the difference between voluntary and involuntary manslaughter. Appellant did not ask the court to give such an instruction. See *Guerin v. State, ante* p. 50; *Price v. Greer*, 29 Ark. 300.

---

\*"11. If you are convinced from the evidence beyond a reasonable doubt that the killing was not done in self-defense as explained in these instructions, but you believe that it was done under a sudden heat of passion or on a sudden impulse caused by terror or fear on account of an assault by the deceased, and the circumstances were sufficient to make the passion or the impulse irresistible, you should find the defendant guilty of manslaughter." (Rep.)

†"9. If you believe from the evidence, beyond a reasonable doubt, that Tom Fielder assaulted the defendant, but there was no cause, under the circumstances of the case at the time, for the defendant to believe that he was in any danger of being killed or of receiving serious bodily injury at the hands of Fielder, but you believe from the evidence beyond a reasonable doubt that the defendant, on account of ill feeling or malice towards the deceased, and not in an honest effort to protect himself, shot and killed the deceased, he would be guilty of murder in the second degree." (Rep.)

Besides, an instruction on involuntary manslaughter would have been clearly abstract because there was no testimony to warrant such instruction.

The court did not err in refusing to grant appellant's prayer for instruction No. 3‡. This instruction was not a correct statement of the law of self-defense, and such portions of it as were correct were covered in other instructions which the court gave on that subject.

6. One of the grounds of appellant's motion for a new trial was the newly discovered evidence of his brother, McKinley Lewis, and his sister-in-law, Hattie Lewis, to the effect that violent hatred existed on the part of the deceased toward the appellant, and that the deceased intended to "get him," meaning thereby to kill the appellant. The court might have found that this evidence of appellant's brother and sister-in-law could have been discovered and produced at the trial if proper diligence had been exercised. The court did not abuse its discretion and did not err in refusing appellant's motion for a new trial on the ground of newly discovered evidence. *Adams* v. *State,* 100 Ark. 203; *Young* v. *State,* 99 Ark. 407; *Osborne* v. *State,* 96 Ark. 400.

After a careful consideration of the record, we are convinced that there are no errors in the rulings of the trial court which call for a reversal of the judgment. Therefore, let the judgment be affirmed.

---

‡"3. In order to justify the killing of Fielder by defendant, it is not necessary that the danger to defendant should have been real. If you find that the defendant believed it to be real, was justified as a reasonable man in so believing, your verdict should be not guilty." (Rep.)