McGRAW v. STATE.

Opinion delivered October 12, 1931.

*Fred A. Snodgress,* for appellant.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

HART, C. J. Jerry McGraw prosecutes this appeal to reverse a judgment of conviction against him for murder in the first degree upon a verdict fixing his punishment at life imprisonment in the State penitentiary.

The first assignment of error is that the evidence is not legally sufficient to sustain the verdict.

According to the testimony of Clark Fulton, he lived at Jacksonville, Pulaski County, Arkansas, about 175 yards from the home of Jerry McGraw. Between six-thirty and seven o'clock one morning, his children cried out that Jerry's house was on fire. He at once started towards the house and saw Jerry before he got there. He went to the kitchen door, and there was no fire in the kitchen; but the living room next to it had been consumed when he got there. The door from the kitchen to the living room was shut. He then said, ''Let's pull this window open and see where the woman is.'' They pushed a window of the front room open, and the flames came out. Jerry did not ask them to help him get his wife out, and they did not hear her cry for help.

According to the testimony of Clayton Carradine, who lived back of the home of the defendant, he first saw smoke coming out of the defendant's house, and called to him two or three times. When he got to the defendant's house, he didn't have on any shoes or hat. He did not at that time say anything about his wife being in the house. They found both the front and back doors of the front room locked. The back door led into the kitchen. He did not hear Jerry's wife making any cries for help. He lived about thirty yards from the defendant's house, and the front room where the body of Jerry's wife was found, was all on fire

when he got there. Jerry was out at the back of the house, and his hair was singed. He was fixing to go over there when he saw Jerry come out of the house. When he got there, no one could have gone in the front room of the house.

According to the testimony of Bertha Neely, she lived across a vacant lot from the defendant's house and heard the defendant and his wife come home early in the morning before daylight before the fire. She heard them talking, but couldn't understand what Jerry had to say. She recognized their voices, and heard Jerry's wife say, "You did, you did; you know damn well you did."

According to the testimony of T. W. Littlejohn, he went to Jerry's house while it was burning, and was among the first to get there. He never at any time heard Jerry make any cry for help to get his wife out of the burning house. A few days later he passed there and examined the locks on the front and back doors, and both doors were locked.

Other witnesses testified about examining the doors and finding them locked after the fire.

According to the testimony of S. E. Thompson, those who found the body put some water on the fire around it. The body was lying across the foot of the bed on the left side with the head of the body to the west. The bed was sitting with its head to the south. The overhead joists of the room had fallen. It seems that one joist missed the foot of the bed, and the other fell somewhere about the middle of the bed, almost right across it. In throwing water over the overhead joists before they burned to ashes, it charred them and left a black place. The skull of the defendant's wife was washed off and showed that it had been cracked in over the right eye. It seemed as if the skull was mashed in there. The lower limbs were burned to the knees. The biggest part of the clothing had been burned up.

According to the testimony of Ralph Graham, he examined the head of the defendant's wife, and there was a cracked place with five or six spangles running

out from the cracked place like you would crack an egg. Witness showed on his own head about where the hole or cracked place was, and said that it was about the size of a half-dollar.

Jerry McGraw was a witness for himself. According to his testimony, his house burned down about seven o'clock in the morning of the 25th day of March, 1931. His clothes and about $80 in money were burned up. He did not set fire to the house. He and his wife returned from a card party at a neighbor's house about two o'clock in the morning. He had been living with his wife thirteen years, and did not quarrel with her on the morning in question. He did not have any insurance on his wife's life nor upon his household goods which were burned up. His arm was burned while he was runing out of the house. He tried to get his wife out of the house but some burning paper fell on them, and his wife jerked loose from him and ran back in the front room. Witness had gotten up early in the morning and had built a fire in the heater in the front room, and had gone back to bed. The roof of the front room was falling in when he woke up again. He denied shooting in the wall close to his wife's head on an occasion about eighty days before the fire. On cross-examination, he was asked if he had not done this in the presence of Bertha Neely, and at the same time told his wife that he ought to kill her, and answered that he had not. On cross-examination, he admitted that he had killed the stepfather of his wife, and had been sentenced to eight years in the penitentiary for murder in the second degree on account of it. He denied having had any argument with his wife on the morning that the house was burned. He admitted that the front door was locked which was their usual custom at night, but denied that there was any lock on the door between the front room and the kitchen. His wife was asleep when he woke up and discovered the fire. After his wife jerked loose from him and ran back into the front room, he went out of the back door.

Another witness testified that he examined the defendant right after the fire, and saw where some of his hair had been burned off, and that he had a little scar on his neck.

Bertha Neely, in rebuttal, testified that just before Christmas preceding the burning of the house, she was at the home of the defendant and saw him shoot a hole through the wall of the house right by his wife's head, and that he said that he ought to shoot her brains out. She denied that she was intoxicated at the time, but said that the defendant and his wife were both intoxicated.

We have made a rather full abstract of the testimony because the conviction was had and a life sentence imposed upon circumstantial evidence; and counsel for the defendant earnestly insist that a verdict of murder in the first degree is not supported by the evidence.

To warrant a conviction of murder in the first degree, the jury must be satisfied beyond a reasonable doubt that the killing was willful, deliberate, malicious, and premeditated. *McAdams* v. *State,* 25 Ark. 405; and *Weldon* v. *State,* 168 Ark. 534, 270 S. W. 968.

The proof, however, need not be express or positive. It may be deduced from all the facts and circumstances attending the killing; and if the jury can reasonably infer from all the evidence the existence of the elements of murder in the first degree, as above set forth, it will be sufficient. *Miller* v. *State,* 94 Ark. 538, 128 S. W. 353; *Davidson* v. *State,* 108 Ark. 191, 158 S. W. 1103; *Owens* v. *State,* 120 Ark. 563, 179 S. W. 1014; *Tillman* v. *State,* 112 Ark. 236, 166 S. W. 582; and *Sneed* v. *State,* 159 Ark. 65, 255 S. W. 895.

The body of Jerry McGraw's wife was found lying across the foot of the bed in their home. The front room in which the body was found, had been practically destroyed by fire. The roof had fallen in and one of the joists had fallen across the middle of the bed, and one joist had just missed the foot of the bed. Neither of

them appeared to have touched the body of the deceased. Her feet and lower limbs had been burned off; and after her head was washed, it was found that her skull had been mashed in over the right eye. One of the witnesses said that it was cracked like an egg, and another said that it seemed like it was smashed in. There was a hole about the size of a half-dollar in her skull. The jury might have inferred from these circumstances that the skull of the wife of the defendant had been cracked by some blunt instrument in the hands of some one. The jury might have thought that if it had been done by the fallen joists, they would have remained on the body; or the jury might have thought that the fall of the joist would not have cracked in the skull in the manner described by the witnesses.

It is true that the defendant denied setting fire to his house or that he killed his wife. The jury, however, were justified in disbelieving his story. According to his own testimony, he tried to lead his wife out of the house after he discovered the fire. He led her in the kitchen, and when some burning paper from the roof fell on them, she jerked away and went back into the front room. He immediately went out at the kitchen door. Several of the witnesses saw him come out of the kitchen door, and all say that he did not make any outcry or give any warning that his wife was still in the house. It does not appear that his senses were paralyzed. Indeed, according to his own testimony, he was in the possession of all of his faculties. While he denied that the door leading from the front room into the kitchen was locked, other witnesses testified that it was locked. None of the witnesses heard the defendant's wife make any outcry. One of them lived in the house right across a vacant lot. Another lived only thirty yards away. One of the witnesses testified that she heard them arguing before day on the morning in question, and heard the wife say to her husband, "You did, you did, you know damn well you did." The jury might have

found from this that the parties were quarreling just a short time before the fire was discovered. According to the defendant's own testimony, after he built the fire in the living room in the heater, he went back to bed, and his wife got up to get breakfast. When he woke up again and discovered the fire, he said that his wife was in bed with him. In a short time after this, her body was found with the lower limbs all burned up and with her skull cracked in over the right eye. As above stated, the circumstances might have led the jury to believe that the skull of defendant's wife had been cracked in by some one, and that that person was the defendant. We are of the opinion that the facts and circumstances shown in evidence warranted the jury in finding the defendant guilty of murder in the first degree. It may be that from motives of mercy, because there was no positive proof, the jury fixed the punishment of the defendant at life imprisonment instead of death. See *Houston* v. *State,* 165 Ark. 294, 264 S. W. 869; and *Hannah* v. *State,* 183 Ark. 810, 38 S. W. (2d) 1090.

The next assignment of error is that the court erred in admitting the testimony of Bertha Neely to the effect that some time about Christmas during the preceding year, the defendant shot a hole in the wall near his wife's head, and said that he ought to shoot her brains out. This testimony was admissible for the purpose of throwing light upon the defendant's motive and also was a link in the chain of evidence along with the other facts and circumstances connecting the defendant with the commission of the crime. The threats made by him just about Christmas of the preceding year were made only about three months prior to the homicide and were not too remote to be admissible in evidence. *Phillips* v. *State,* 62 Ark. 119, 34 S. W. 539; *McElroy* v. *State,* 100 Ark. 301, 140 S. W. 8; *Lewis* v. *State,* 155 Ark. 205, 244 S. W. 458; *Combs* v. *State,* 163 Ark. 550, 260 S. W. 736; and *Crowe* v. *State,* 178 Ark. 1121, 13 S. W. (2d) 706.

The next assignment of error is that the court erred in permitting the prosecuting attorney to ask the defendant on cross-examination concerning his conviction for the killing of his wife's stepfather. There was no error in this. It is well settled that the defendant may be questioned, when he becomes a witness in his own behalf, as to specific acts to test his credibility. He admitted on cross-examination that he had been convicted of murder in the second degree, charged to have been committed by killing his wife's stepfather. The court told the jury that the evidence was admitted for the purpose of testing his credibility as a witness, and for no other purpose. *Turner* v. *State,* 153 Ark. 40, 239 S. W. 373; and *Bullen* v. *State,* 156 Ark. 154, 245 S. W. 493.

Finally it is insisted that the court erred in allowing the prosecuting attorney to tell the jury that in his opinion the defendant was guilty of murder in the first degree, and should suffer the death penalty. The record shows that the prosecuting attorney told the jury that this was his own opinion under the evidence adduced in the case, and was a mere expression of the attorney's opinion as to the guilt of the defendant, under the evidence, and was not improper. *Dixon* v. *State,* 162 Ark. 584, 258 S. W. 401; *Cunningham* v. *State,* 133 Ark. 154, 202 S. W. 27; and *McClaskey* v. *State,* 168 Ark. 339, 270 S. W. 498.

We find no reversible error in the record, and the judgment will be affirmed.