SNEED v. STATE.

Opinion delivered May 7, 1923.

1. HOMICIDE—ABSENCE OF MOTIVE.—While it is competent to prove the presence or absence of motive in determining the issue of guilt or innocence, and while such proof is always a cogent factor relative to that issue, yet, if the testimony be otherwise legally sufficient to prove guilt, a verdict of guilty cannot be set aside because of failure to prove a motive for the crime.

2. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Proof of the affectionate conduct of defendant and his wife toward each other held not sufficient, as matter of law, to overcome the evidence of his guilt under the evidence in the record.

3. CRIMINAL LAW—MISCONDUCT OF JUDGE.—Alleged remarks and misconduct of the trial judge will not be considered on appeal unless objected to at the trial.

4. CRIMINAL LAW—INSTRUCTION AS TO FORMER TRIAL.—It was not error in a murder trial to instruct the jury not to consider the former trial of the case and the result thereof, and that it had no effect upon the case except that, if the jury should find the defendant guilty of murder in the first degree, they could only fix his punishment at life imprisonment, which was the punishment fixed by the jury in the former trial.

5. CRIMINAL LAW—SUBSTITUTE FOR BILL OF EXCEPTIONS.—A motion for new trial and affidavits in support thereof cannot be used as a substitute for a bill of exceptions to bring up for review matters that occurred during the trial.

Appeal from Craighead Circuit Court, Jonesboro District; R. E. L. Johnson, Judge; affirmed.

J. H. Hawthorne, F. C. Mullinix, L. C. Going, and Gautney & Dudley, for appellant.

Evidence not sufficient to sustain verdict of murder in first degree. The conduct of the trial judge and the manner of his rulings indicated to the jury that he

favored the prosecution, believed defendant should be convicted. 69 N. W. (Ia.) 274. The court erred in excluding evidence offered by the State and refusing to exclude evidence of the State, in commenting on the weight and effect of the evidence when ruling on the competency of the will of Mrs. Sneed, and the prejudicial effect was not removed by later allowing all the will to be introduced. Court erred in refusing to give appellant's requested instruction No. 14. It would have tended to correct the misleading instruction on reasonable doubt. 135 Ark. 159; 149 Ark. 346. Error was committed also in refusing to instruct the jury that they should not consider for any purpose the verdict of conviction on the former trial. 72 Ark. 138; 125 Ark. 314. The court erred in permitting improper argument by attorneys for the State and in making improper comment on the objections thereto. 58 Ark. 473; 62 Ark. 516; 95 Ark. 233; 74 Ark. 259.

*J. S. Utley,* Attorney General, *Elbert Godwin* and *Wm. T. Hammock,* Assistants, for appellee; *N. F. Lamb,* special counsel.

The evidence amply sustains the verdict—leaves no room for doubt of guilt of appellant. There was no misconduct of the trial judge nor anything in his manner of ruling or statements that could have indicated to the jury an opinion on the weight of testimony or guilty of appellant. No exceptions were reserved to any alleged misconduct. No error was committed in instruction to the jury relative to the former's verdict. Neither was there any error in excluding or admitting testimony. No error in refusing instruction No. 14. There is comparatively little circumstantial evidence in the record. No error committed in connection with the alleged improper argument to the jury. No exception saved on this subject. C. & M. Digest, § 3228, also §§ 1321, 1322; 88 Ark. 350; 119 Ark. 152; 87 Ark. 543; 57 Ark. 1; 56 Ark. 563.

Wood, J. The appellant was indicted for the crime of murder in the first degree in the alleged killing of his wife, Cora Sneed, by poison. This is the second appeal in this case. *Sneed* v. *State,* 143 Ark. 178. Both trials resulted in a verdict of murder in the first degree, fixing the punishment at imprisonment for life. The appellant contends that the judgment from which this appeal comes should be reversed upon the following grounds:

1. That the evidence is not legally sufficient to sustain the verdict.

2. Alleged misconduct of the trial judge.

3. Errors in excluding evidence offered by appellant and in refusing to exclude evidence of the State.

4. Errors in granting and refusing prayers for instructions.

5. Errors in refusing to sustain objection to improper argument and in making improper comment on the objection.

We will dispose of these in the order mentioned.

First: Counsel for the State, after making certain additions to the abstract of appellant, begin their brief by saying: "The evidence is so complete and conclusive of Sneed's guilt that there is no room for doubt in the mind of any impartial man." Counsel for the appellant, after stating the effect of the evidence as contained in their abstract, say: "The more rational view of the evidence is that she (Mrs. Sneed) did not die from the effects of strychnine poisoning, but that the cause of her death, so far as her doctors are concerned, and so far as the evidence shows, was unknown." Since there is this wide divergence of view by opposing counsel as to the effect of the evidence, we have thought it necessary to read the record of the evidence for ourselves, and, after having done so, our conclusion is that the evidence was legally sufficient to sustain the verdict. The record of the evidence covers more than six hundred

pages of the transcript. Hence we can only give a synopsis of it.

The testimony adduced for the State tended to prove that about the 18th of August, 1919, Cora L. Sneed became ill, as she supposed, from a cold contracted during her menstrual period. After doctoring herself a few days with a "round of calomel," on Friday, the 22nd of August, she was seized with violent convulsions. The appellant sent for neighbors. When they arrived, they urged him to send for physicians, and he replied that he had sent for Dr. Bone, his family physician, who lived twelve miles distant. Other doctors lived in the city near by, and were not immediately called. Finally Dr. Walker was called early in the morning. He administered chloroform and morphine until the convulsions subsided, and left at nine o'clock. Dr. Bone arrived about 10:30 a. m. Dr. Walker returned about 11 o'clock, and they concluded that Mrs. Sneed was ill from the effects of severe constipation, and treated her for that. Among other things prescribed for her they left from twelve to seventeen thirtieth-grain strychnine tablets, to be given every three or four hours, as needed, to quiet her nerves. On the Sunday night following she was seized with similar convulsions to those had on Friday. The family physician was not notified of this attack.

Will Jinks, a brother of Mrs. Sneed, who was not on friendly terms with appellant and Mrs. Sneed, heard of her illness, and went to her home. He suspected that Sneed might be poisoning his sister, and suggested that another doctor be called, which was done, and this physician, in connection with the family physician, continued the treatment for "locked bowels." On Sunday night Dr. Lutterloh was called in. He and Dr. Bone continued the same treatment. Dr. Lutterloh left three sixtieth-grain strychnine tablets to be taken, and some other medicine. At the suggestion of Dr. Lutterloh, Dr. Altman was also called. On Monday Mrs. Sneed had other convulsions of a lighter character, but by Wednesday

she was greatly improved and considered out of danger. After this spell she became apparently well, except that she was weakened as the result of her recent illness. During the latter part of this illness Dr. Bone had prescribed for her nervousness potassium bromide and strychnine injections when needed.

About four weeks from the time the illness just mentioned began, two little girls were at Sneed's home. Mrs. Sneed was looking after the laundry. Sneed came into the room where his wife was, and in a playful spirit jumped and boohed at her. She became nervous, and lay down on the bed. Sneed went out to play ball with a child, and returned in a short while. He went into the kitchen and returned with two glasses of medicine with about three-fourths of an inch of liquid in each glass, one a brown color and the other white, and gave the same to his wife. This was about eight o'clock. About an hour thereafter Mrs. Sneed was again in violent convulsions of the same type that she had had on the former occasions. Neighbors were called, and insisted on appellant calling a doctor rather than to wait for Dr. Bone, whom Sneed had already called. During this last attack Mrs. Sneed said, "Get a doctor quick, but don't touch me." The appellant didn't call for a doctor in town, and refused to permit one to come until the family physician arrived. Dr. Bone came about 10:30. He called in Dr. Ratcliff. Mrs. Sneed had been in convulsions about two and a half hours when Dr. Bone came, and she died at 11 o'clock. While Mrs. Sneed was in convulsions on the night of her death, appellant administered hypodermically one-sixtieth grain of strychnine at an interval of an hour, dividing it into two doses. During the convulsions Mrs. Sneed was perfectly rational. When the convulsions would subside she would say "I am going to have another spell," and would beg them not to let her have any more. She told the neighbors that she knew what was going on and

knew they were sympathizing with her, but she could not speak.

Medical experts testified that consciousness during convulsions was never present in any other ailment except lockjaw (tetanus). Mrs. Sneed did not have lockjaw. The character of the convulsions was described before the jury as follows: Rigid condition of the body, head drawn back and heels drawn taut against the bed; toes turned out, extremely rigid; fingers drawn and clinched like bird-claws; eyes glassy and staring, and the corners of the mouth contracted, giving the face a meaningless grin. After death there were livid or purple splotches on her neck and face and other parts of her body, characteristic of strychnine poisoning. None of the doctors who attended Mrs. Sneed during her last illness had ever been called before to treat a case of strychnine poisoning, and those of them who witnessed her during her convulsions did not suspect at the time that she had been poisoned, but all of them testified that the convulsions described were typical of strychnine poisoning as defined by the best medical authorities; and, in answer to hypothetical questions describing the convulsions of Mrs. Sneed, several of the experts testified that, in their opinion, the death of Mrs. Sneed was the result of poisoning by strychnine. Portions of the body of Mrs. Sneed were subjected to chemical analysis, according to the most approved methods, and the chemist ascertained that the portions of the body examined contained what he estimated to be one-tenth of a grain of strychnine, and the whole body would contain, according to correct standards of estimate and measurement, as much as one grain, which, the expert showed, would be sufficient to kill. The chemist and other experts testified that a grain was a deadly dose of strychnine; that where it is given in medicinal doses every three or four hours in thirtieth or sixtieth grains it was not possible for it to accumulate in a quantity large enough to produce death; that strychnine does not accumulate, and is

rapidly eliminated from the body; that a half, and even a quarter, of a grain had been known to kill.

About seven days before the death of Mrs. Sneed the appellant asked a druggest in Jonesboro if he had thirtieth-grain hypodermic strychnine tablets. The druggist did not have the hypodermic tablets, but sold Sneed one hundred thirtieth-grain triturates—tablets to be taken internally. Sneed and his wife had no living children. There was testimony for the State tending to prove that Mrs. Sneed had inherited considerable property from her mother, Mrs. Jinks, but they had practically spent it all at the time of Mrs. Sneed's death. Mrs. Sneed had made a will devising all of her property to her husband. At the time of her death Mrs. Sneed had life insurance policies amounting to $5,000 in which the appellant, her husband, was the beneficiary. During the night after the death of Mrs. Sneed appellant was drinking, and also on the following night. He knew, or suspected from what he had seen, that an inquest and a probable autopsy would be held on the body of his wife. He told one of the neighbors that he had had three specialists at his home to examine Mrs. Sneed, and had their certificates showing that she was afflicted with goiter. He referred to the anticipated inquest and autopsy, and drew his hand across his throat saying, "It means this for me." On the night while the undertaker was embalming the body Sneed asked one of his neighbors to request the undertaker to save the blood of his wife, that he wanted the same for his protection in the event of trouble. He asked one of the members of the coroner's jury to take a drink with him, and another person also, displaying two pint bottles of liquor. He exhibited a pistol, and abused one of his neighbors (who had invited Jinks, his brother-in-law, home for supper after the death of Mrs. Sneed), for not telling appellant about the coroner's jury and for entertaining Jinks. He stated that if the coroner's inquest were held and investigation made, "It will mean this for me," drawing

his hand across his throat. After the coroner's jury arrived, Sneed, while "pretty drunk," came to the door of the room and said: "Look her over, look her over good, strip her off and look her over."

The appellant adduced testimony which tended to prove that the most tender and affectionate relations had always existed between himself and his wife from the time of their marriage down to the hour of her death. Upon her death he manifested the grief that was usual and natural for one who had lost a beloved companion. The testimony tended to prove that Mrs. Sneed had goiter. According to his family physician, appellant, after he had been drinking, and when he had eaten certain sweets, was afflicted with indigestion, and the doctor had prescribed strychnine, and he had been taking same regularly for his ailment. Experts in appellant's behalf, in answer to hypothetical questions, testified that it could not be stated with any degree of certainty whether the amount of strychnine found in the remains of Mrs. Sneed was due to an overdose, or to an accumulation of strychnine. One of the experts, an experienced bacteriologist, testified that in making a chemical analysis, such as was shown on behalf of the State, unless an exceedingly large amount should be found he doubted whether one would be justified in saying positively that death resulted from an overdose of strychnine.

The appellant, in his testimony, admitted that he had purchased strychnine from the druggist a short time before his wife's death, but stated it was for his own use, as he was accustomed to taking it. He admitted that he had administered strychnine after she became ill, but stated that he did so under the doctor's directions. He denied that he had given her any strychnine otherwise. He explained that, as to the two doses given from the two glasses on the night of her death, the brown dose was potassium bromide and the white was buttermilk. He admitted that he made the statements attributed to him in regard to the coroner's inquest, to-wit,

"It will mean this for me," drawing his hand across his throat, but stated that he meant it in a different sense from the way it had been construed. He denied the unseemly conduct attributed to him by the witnesses in regard to the examination of his wife's body. Other witnesses also in his behalf testified that he did not say, in the presence of the coroner's jury, "There she is, gentlemen, strip her off and take a look at her." Appellant and other witnesses in his behalf also denied the other unseemly conduct attributed to him, soon after the death of his wife, by witnesses on behalf of the State. Appellant stated that his wife had been ill with goiter, and that he had specialists to examine and treat her, and that she had not been a well woman for a long time before her death. He detailed fully to the jury what he did in waiting upon his wife during her last illness. Among other things, he stated that he did not give his wife anything to kill her, and would not have done so. He loved her devotedly, and nothing had ever occurred during their married life to estrange them.

While there was much more testimony, it would unduly extend this opinion to further set it forth. The above are the salient facts which the testimony for the State and the appellant tended to prove.

Now, we cannot agree with learned counsel for the appellant that the "more rational view of the evidence" is that Mrs. Sneed died from natural causes, brought about by disease rather than from strychnine poisoning. On the contrary, it occurs to us that the more reasonable view is that her death was the result of being poisoned by strychnine. Mrs. Sneed died in convulsions, which, according to the undisputed evidence, were typical of strychnine poison, and not typical of goiter or any other disease save tetanus, and she did not have tetanus. The jury might have found that the condition of her body after death indicated that she had been poisoned by strychnine, and that strychnine in a deadly quantity was found in her remains. But counsel for appellant, in

oral argument, strenuously urged that, even if this were true, still there was no testimony to prove that the strychnine which was found in her body and which caused her death was the result of an overdose administered intentionally by the appellant, rather than the effect of an accumulation from medicinal doses administered to her under the directions of the doctor during her last illness.   Counsel are not correct in this contention, because the jury might have found, from the testimony of the chemist and other experts, that the amount of strychnine found in Mrs. Sneed's body after death could not have been the result of medicinal doses; that it would have been impossible, under the conditions that existed from the time she first became ill until her death, for medicinal doses of strychnine, given as directed by attending phyicians, to have accumulated in an amount sufficient to cause her death.   If, as the jury found, the death of Mrs. Sneed was the result of strychnine poison, then the jury were justified in finding that the appellant administered same in a deadly quantity.   The proof shows that the doctor had instructed him how to administer it hypodermically.   Sneed therefore had the means and the opportunity of killing his wife.

But counsel insist that his course of conduct throughout his wife's illness and their married life was entirely inconsistent with his guilt.   In other words, the effect of the argument is that there was no motive for the killing. The State contends that the motive was to obtain life insurance money on policies insuring the life of Mrs. Sneed in which appellant was named as the beneficiary.

While it is competent to prove the presence or absence of motive in determining the issue of guilt or innocence, and while such proof always is a cogent factor relative to that issue, yet if the testimony be otherwise legally sufficient to prove guilt, a verdict of guilty cannot be set aside because of failure to prove a motive for the crime.   *Ince* v. *State,* 77 Ark. 418; *Scott* v. *State,* 109 Ark. 391; 2 Wharton on Circum. Ev., 1646, §

878.   This is a wise rule of law.   It is sometimes impossible to penetrate the human mind and discover any motive whatever for the most enormous crimes. Motives that influence the will and impel the commission of horrible crimes may be, and often are, as unfathomable as Erebus.   Nevertheless, upon the plainest principles of reason and justice essential to the common security of society as a whole, the criminal actor, when found, must be punished, whether any motive for his act can be proved or not.

Learned counsel for appellant in their oral argument stressed the testimony proving the tender and affectionate conduct of appellant and his wife toward each other throughout their married life, and rely upon presumptions of fact which nature and the law attach to such conduct as forbidding the possibility of appellant's guilt under the evidence in this record  2 Wharton, Cr. Ev., p. 1653, § 881.   But it cannot be said, as a matter of law, that, because of the sacred relation of husband and wife, and because witnesses testified that they manifested unusual affection for each other, therefore appellant could not and did not kill his wife under the circumstances disclosed by the evidence.   For, notwithstanding the relation of husband and wife and the natural presumption of affection between them growing out of it, it is nevertheless true, as stated by Mr. Burrill, that "in particular cases, too numerous, unhappily, for the credit of humanity, these affections have been found to interpose no sort of bar to the gratification of either the gainful or revengeful impulse to murder; or, to speak with more precision, that the affections presumed from the relations of the parties have not, in fact, existed." Burrill on Circum. Ev., p. 322; see also Wills on Circumstantial Ev., 43-44.

Second:   Under the head of the misconduct of the trial judge, showing his bias and prejudice against the defendant, counsel contend that the court erred in making certain comments while excluding the offered testi-

mony of witnesses, Mrs. Hay and Cole. This assignment of error is not made one of the grounds of the motions for a new trial, and we therefore cannot notice it.

Counsel objected also to certain comments of the court in excluding certain portions of the will of Mrs. Sneed, which appellant offered in evidence. The record shows that, when the will was offered, the State objected to certain portions of it, and in making its ruling the court sustained the objection and gave the reason for such ruling, "to which ruling the defendant at the time excepted and asked that his exception be noted of record, which was accordingly done." It appears that after the above ruling, the State withdrew its objection to the introduction of the entire will, and the same was read to the jury. It does not appear that appellant objected specifically to any remarks of the court that were made in excluding a portion of the will. The objection was to the ruling of the court in excluding any portion of the will and not to the remarks made by the court. Furthermore, we find that the remarks themselves could not be construed in any way as an expression of the court's opinion on the merits of the case, and were not prejudicial to appellant.

Under this head, as one of the grounds of the motion for a new trial, the appellant sets up that one Dr. W. F. Jinks, an uncle of the deceased, sat by the trial judge while the trial was in progress and held frequent whispered conversations with him during the taking of testimony; that the conduct of the judge could easily be observed by the jury, and was observed by various persons in the audience, who made frequent remarks concerning same. Appellant also alleged that the presiding judge held frequent conversations with Will Jinks, brother of the deceased, during the taking of the testimony in the presence of the jury. This ground was supported by the affidavits of three persons, who stated therein that they were present during the progress of the trial and observed the conduct of the judge as above set forth.

"Impartiality," says Justinian, "is the life of justice." With this thought in mind, the framers of our Constitution provided "that judges shall not charge juries with regard to matters of fact, but shall declare the law." This provision was intended to prevent trial judges from expressing any opinion on the merits of the issues of fact pending. Issues of fact under our juridical system, are for the jury. It certainly violates the spirit of the Constitution, if not the letter, for a trial judge, by any conduct of his, to indicate to the jury what his own convictions are as to the merits of the case. As the presiding genius of the proceedings, the trial judge should hold the aegis of the law with firm and impartial hand over the rights of all litigants. He should scrupulously avoid manifesting, by act or word, any fear of, or any bias for or against, any one connected with the cause. Unless he does so, the jury will be impressed with his personal feelings or convictions in the matter they are to determine. See *Tharp* v. *State,* 51 Ark. 147, 155-6. If it were established that the trial judge was guilty of the conduct attributed to him, we would not hesitate to reverse on account thereof, because such conduct necessarily would be fraught with great prejudice to the accused. But no exceptions were saved to the alleged misconduct of the trial judge at that time, nor at any time before the verdict. If objection had been made and his attention directed to the alleged misconduct of which appellant now complains, the trial judge might have instructed the jury so as to inform them that he had no opinion whatever on the merits of the cause. He at least should have been given that opportunity. It would not do to set aside the verdicts of juries on account of the alleged misconduct of trial judges upon the mere affidavits of on-lookers, especially when such affidavits are controverted in all essential particulars, as they are here. See *Pendergrass* v. *State,* 157 Ark. 364. There is no reversible error when the trial court finds, upon conflicting affidavits,

as it does here, that there is "no merit and substantially no truth in the affidavits with reference to Dr. W. F. and W. H. Jinks and their treatment or association with the court during the trial, and that the statements contained in the affidavits of said W. F. and W. H. Jinks are true and correct."

Third: We find no prejudicial error in the ruling and remarks of the court with reference to the introduction of the will of Mrs. Sneed.

During the cross-examination of appellant he was asked, over the objection of appellant, how many children he had by a former marriage, and answered, "Two." He was then asked where they were, and answered that he did not know—that they were with their mother's people. Their grandfather adopted them into his family. It had been developed, on cross-examination, without objection, that Sneed was born in Illinois, had lived in Kentucky, had been twice married before, that his first wife had died, and he had obtained a divorce from his second wife; that he had come to Arkansas from Kentucky under an indictment, and went for a time under an assumed name in this State. It was while his former history was thus being traced, as testing his credibility, that the above questions were asked. The testimony was relevant in the connection in which it was elicited. *Hollingsworth* v. *State,* 146 Ark. 387; *Hunt* v. *State,* 114 Ark. 239-243; *Pearrow* v. *State,* 146 Ark. 201-206. But, even if it could be said that the testimony was too remote to throw any light on the credibility of appellant, still there was nothing in the answers to the questions prejudicial to him.

Fourth: The court did not err in refusing to give appellant's prayer for instruction No. 14.* The instruction was argumentative in form. Besides, it was fully covered in correct instructions which the court gave on the subjects of reasonable doubt and circumstantial evidence.

After the conclusion of the argument the court told the jury "that the former trial of this case and the result of it is not to be considered by you in deliberating upon your verdict for any purpose whatever, and it has no effect upon this case, except the one which the law gives it, which was to the effect that, if the jury should find the defendant guilty of murder in the first degree, they could only fix his punishment at imprisonment in the State Penitentiary for life." The appellant objected to the instruction on the ground that "the jury must not consider the former verdict for any purpose, as it has no weight as evidence in the case." There was no error in the instruction, and it was a proper one to give. References to the former trial had been made throughout this trial, during the selection of the jury, the opening statement of counsel, the taking of testimony, and the arguments of counsel before the cause was finally submitted. The instruction therefore was proper, and, if any prejudice had been lodged in the minds of the jury by these references, this instruction had the effect to remove it. The instruction was tantamount to telling the jury that they could not consider

---

*Appellant's request No. 14 was as follows: "14. If the evidence produced by the State is circumstantial, or there is no direct and positive evidence that a crime has been committed, or that defendant is guilty thereof, to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by the evidence beyond a reasonable doubt, and all facts necessary to such conclusion must be consistent with each other and with the main facts sought to be proved, and the circumstances taken together must be of such a conclusive nature as to induce in the minds of the jury the reasonable belief that the defendant is guilty beyond a reasonable doubt and must exclude every other reasonable hypothesis save that of defendant's guilt" (Rep.).

the former trial or verdict as evidence in the cause, and thus fully met appellant's objection in this respect. The effect of the instruction was to tell the jury that, as appellant had once been put upon trial for murder in the first degree and the punishment in that case fixed at life imprisonment, if they should return a verdict of guilty they could not punish him by death. It was proper for the court to instruct the jury as to the form of its verdict and as to the punishment, in case they should return a verdict of guilty, so that they might not be misled and possibly return a verdict in a form that would result in a mistrial because of former jeopardy. Article 2, § 8, Const.; *Johnson* v. *State,* 29 Ark. 31; *Stewart* v. *State,* 13 Ark. 720; *State* v. *Clark,* 32 Ark. 231.

Fifth: The eighth ground of appellant's motion for a new trial is as follows: "During the closing argument in said cause, and while said closing argument was being made by Honorable N. F. Lamb, attorney for the State, said attorney stated, in substance, that the jury should not give to the evidence of Sneed any weight; that Sneed had been convicted of this crime by one jury and sentenced to the penitentiary for life, and that the jury should not believe his testimony in preference to that of other witnesses; to which remark counsel for defendant at the time objected as improper, and asked the court to instruct the jury not to consider the fact that said Sneed had been convicted of the crime of murder in the first degree and sentenced by a jury to the penitentiary for life in the former trial, and to exclude it from their consideration, which objection was overruled by the court, and said request denied."

In support of this ground appellant presented the affidavit of Judge Dudley, one of appellant's counsel, who states therein, among other things, that he was present during the closing argument of Mr. Lamb, employed counsel for the State; that in commenting upon the testimony of the witnesses Mr. Lamb stated as follows: "He (appellant) had been convicted of this crime

by one jury and sentenced to the penitentiary for life, and that this jury should not believe his testimony in preference to that of other witnesses.'' Judge Dudley states that he arose and objected to the argument as improper; that he called the attention of the court and Mr. Lamb to the fact that the stenographer was absent, and he wanted no controversy or misunderstanding about what took place, and requested them to remember what transpired in order that it might be reduced to writing and incorporated in the bill of exceptions; that he asked the court to instruct the jury not to consider Mr. Lamb's statement for any purpose, and to exclude it from the consideration of the jury, which the court refused to do, and remarked, ''Let the record show the objections and the opening statement of Judge Gautney,'' to which he (Judge Dudley) at the time excepted; that on the following morning he (Dudley) reduced to writing the objectionable remark made by Mr. Lamb and his request to the court, and the court's refusal to act. He then went immediately to the courthouse and found Judge Johnson on the bench, but court had not convened. He told Judge Johnson that he had reduced to writing what had transpired the night before with reference to Lamb's argument, and gave him the same, and also a copy to Mr. Lamb before the jury was sent out to consider its verdict. The court took no other action with reference to it. The court did not remark, at the time the affiant objected to the remarks of Mr. Lamb, that ''such remarks were permissible only on account of the statement and remark of Judge Gautney, and that the jury would not consider said former verdict for any purpose.''

The appellant also presented the affidavits of H. L. Phelps and Claude B. Brinton, who stated that they were present in court during the closing argument for the State by Mr. Lamb, and that in his argument he stated to the jury that Sneed was a convict and ought not to be believed by the jury, for he had been convicted

of this crime before by a jury and sentenced to the penitentiary for life; that at the time Judge Dudley arose and objected to the remark, and asked the court to tell the jury not to consider it; that the court overruled his objection, and the argument went on. These two affiants stated that they were not related to the appellant or to any one connected with the lawsuit, and had no connection with the cause.

The State, in rebuttal, presented the affidavits of Mr. Lamb and Prosecuting Attorney Shane. Among other things, Mr. Lamb stated, in substance, that he did not say to the jury at any stage of the argument that they should not give any weight to the evidence of Sneed, but did say to them that the evidence given by him stood practically alone and uncorroborated, and that if the jury wanted to believe Sneed instead of numerous other disinterested witnesses who contradicted him, it was their privilege to do so, but that he had testified with the sentence of punishment for life staring him in the face, and that, if the jury should believe him instead of numerous disinterested witnesses whose evidence contradicted him, we might as well abandon our courts; that, upon objection being made to these and other remarks by Judge Dudley, the court, in ruling upon the objection, stated to the jury at the time that the remarks of counsel were permissible only on account of the statements and arguments of Judge Gautney, but the jury must not consider the former verdict for any purpose.

Mr. Shane, the prosecuting attorney, in his affidavit corroborated the statements of Mr. Lamb as to what occurred in connection with the matters mentioned in the eighth ground of the motion for a new trial. The record shows that the court, in overruling the motion for a new trial, among other things in connection with the eighth ground stated as follows: That N. F. Lamb made the closing argument in behalf of the State, and in so doing referred to said former conviction and punishment

fixed, and explained to the jury why the State had not qualified them upon the subject of the death penalty, said reference and explanation being as set forth in said affidavits of Lamb and Shane; that an objection was made by Judge Dudley to any reference by opposing counsel to said former verdict and punishment, and the court stated to the jury that such argument was only permissible on account of the statements made by Judge Gautney in both the opening and closing argument, and the purpose of such explanation, but should not be considered by the jury for any other purpose.''

Now conceding, for the purpose of the opinion, that Mr. Lamb made the remarks above set forth, which are here challenged, the record proper does not show that any objection was made to the remarks at the time, nor that any exceptions were saved to any ruling of the court concerning same. It appears that the court's order in overruling this ground of the motion for a new trial states as follows: ''That an objection was made by Judge Dudley to any reference by opposing counsel to said former verdict and punishment,'' etc. Even if this recital could be considered an exception as well as an objection, it does not reach to the remarks contained in the eighth ground of appellant's motion for a new trial. The bill of exceptions signed by the trial judge does not show that any objection was made or exception saved to the remarks at the time they were made. There is no bill of exceptions by bystanders showing that objections were made and exceptions saved to the remarks of Mr. Lamb. In his affidavit Judge Dudley does not say that the statement prepared and presented by him to the judge the morning after the alleged argument occurred was intended as a bill of exceptions by bystanders and presented as such for his acceptance or allowance. On the contrary, he says that he was taking such precaution in order that the court and Mr. Lamb might remember what transpired, that same might be reduced to writing and incorporated *in the bill of exceptions.* Moreover,

even if it could be said that it was intended by Judge Dudley as a bill of exceptions by bystanders, that statement is not brought into the record, and it is nowhere shown, either in the affidavit of Judge Dudley or other affidavits, that the exceptions were presented to the trial judge and rejected by him. This was absolutely essential. There was nothing in the bill of exceptions signed by the presiding judge identifying any affidavits as having been presented to him as a bill of exceptions and refused by him. Therefore we are bound to hold, unless we overrule many former decisions of this court, that there is no bill of exceptions, and that the appellant has not complied with the statute by presenting for our consideration a bill of exceptions containing the matters in the eighth ground of appellant's motion for a new trial. A motion for a new trial and affidavits in support thereof cannot be used as a substitute for a bill of exceptions to bring up for review matters that occurred during the progress of the trial. Secs. 1317, 18, 21, 22, C. & M. Digest. See *Fordyce* v. *Jackson,* 56 Ark. 563; *Vaughan* v. *State,* 57 Ark. 1; *Ayer-Lord Tie Co.* v. *Greer,* 87 Ark. 543; *Cox* v. *Cooley,* 88 Ark. 350; *Pearson* v. *State,* 119 Ark. 152.

There is no reversible error in the record, and the judgment is therefore affirmed.

HART and SMITH, JJ., dissenting.