JOHNSTON v. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA.

Opinion delivered December 22, 1930.

*Wilson & Martin* and *Compere & Compere,* for appellant.

*Wynne & Miller,* for appellee.

SMITH, J. Appellant is the widow of Sam Carson Johnston and is the beneficiary in a policy of insurance on his life issued by the Order of United Commercial Travelers of America, hereinafter referred to as the order. The insured was found dead in the municipal natatorium in the city of Monroe, Louisiana, on the morning of January 4, 1927, and this suit was brought soon thereafter when the order denied liability.

The constitution and by-laws of the order, which are made part of the insurance policy, provide that "This order shall not be liable to any person for any benefit for any death * * * resulting from self-destruction (whether sane or insane) of the insured," and, further, that: "This order shall not be liable to any person for any benefit for any death, * * * injuries (fatal or otherwise) intentionally inflicted by others (except where such injuries are inflicted for the sole purpose of burglary or robbery or by an insane person) the intention to commit burglary or robbery to be established by the claimant and the insanity to be established by a court having competent jurisdiction."

There was a verdict for the defendant order, and a judgment accordingly, which the order insists should be affirmed, notwithstanding the assignments of error, for the reason that the undisputed testimony shows that deceased died by his own hand.

The insured had been an active business man, and had made money, but financial reverses came. He became a member of a partnership which attempted to put on the market a patented automobile grease gun, but he lost his investment. He borrowed money from his wife, which was also lost in the same investment. At the time of his death deceased and his wife were not living together, although there does not appear to have been a permanent estrangement. Insured borrowed $500

from a brother-in-law just before the holidays, and borrowed smaller sums from his friends with which he paid current expenses. He remarked to several of his friends that he had involved his wife, but that he "would square that by bumping off," as he carried sufficient insurance for that purpose. He was not a dissipated man, yet he drank heavily during the week preceding his death, and was confined for two nights in the city calaboose on that account. A friend procured his release on Sunday, and he was found dead the following Tuesday.

On the morning the insured's dead body was found, a street car motorman observed an automobile parked near the municipal natatorium with some letters lying on the seat. He reported that fact to the engineer at the power house, who, in turn, called L. V. Tarver, a city detective. Tarver testified that he went to the city park, where he found the car, with two letters on the seat. One was addressed to R. D. Swayze, and the other to Laza Caspari. Witness sent word to Swayze, and when the latter came the letter addressed to him was opened and read. Both Swayze and Caspari identified the letters addressed to them as having been written by the insured. The letter to Swayze reads as follows:

"Mr. R. D. Swayze.

"Dear Friend: I request that you and Mr. Caspari take charge. Be sure that preparations are inexpensive. Arrange to have my Shrine insurance transmitted to my dear little wife by wire, one of the very best and truest little mates that ever lived. Help and advise her.

"Sam C. Johnston.

"My bag and overcoat are in room 16 Bohemia Hotel. My lodge receipts are in my pocket book inside my bag. I owe 8 days' room rent please pay and have my wife reimburse you."

The other letter was of similar purport.

Tarver and Swayze went to the pool, where, about the middle of the north end, there was a derrick, framework that held up a shoot-the-shoot, and resting on one

of the cross-pieces supporting that framework they discovered the body about four feet under the water. The body was sixteen or eighteen feet from the north end of the pool.

Dr. C. P. Gray, the coroner, was notified, and upon his arrival the body was removed from the pool. Dr. Gray testified that he had been coroner of the parish for twenty years; that he was a practicing physician, and that he had made a special study of similar cases, and that, in his opinion, there was no question but that the deceased had committed suicide. The testimony of this witness was taken by deposition. Dr. Gray further testified that, when the body was taken out of the water, an open knife was found tightly clutched in the right hand. There were three cuts in the neck, which began at the left ear and stopped just before reaching the mid-line of the neck in front. The wounds had cut through the skin and the larger blood vessels on the left side of the throat and the deceased had died from the loss of blood resulting from severing the larger blood vessels in the throat. There was a small amount of coagulated blood on the knife where the blade went into the handle, and the blade of the knife was protruding between the thumb and first finger of the right hand of the deceased when his body was removed from the water, the cutting edge of the knife being turned towards the body.

If the facts just detailed were admitted to be true, or were undisputed, we would not hesitate to hold that only one inference could be deduced from them, and that is, that insured committed suicide, in which event it would be unnecessary to review the record for error in the trial; but there is some dispute in the testimony, and we are unable to say that the undisputed facts are such as to compel all reasonable minds to reach the conclusion that the insured committed suicide.

Just here it may be said that there was some testimony to the effect that deceased had become much embittered at one of his business associates and another party, but there is no testimony warranting the submis-

sion of the question whether these men, or either of them, might have killed him. It would not help plaintiff's case, however, if these men, or either of them, had killed the insured, for there is not even a suspicion that they did so for the purposes of burglary or robbery. The death of the insured at their hands, except for purposes of burglary or robbery, or unless they were insane, would have given no cause of action under the provisions of the policy set out above.

The application of deceased for the policy sued on was offered in evidence, and his signature thereto was sufficiently identified to use it as the basis of comparison with the signature to the letters in the deceased's automobile, and the addressees in these letters both testified that they recognized the signatures as those of Mr. Johnston, the insured. But Mr. Johnston's wife and stepdaughter both testified that the signatures were not those of Mr. Johnston, and this conflict in the testimony makes a question for the jury as to the genuineness of the signature. In addition, the stepdaughter testified that Mr. Johnston was left-handed and, in eating, held his knife in his left hand, whereas, when the body was found, the bloody knife was in the right hand. We cannot, therefore, say that the undisputed testimony shows a case of suicide, and, this being true, it cannot be said that no prejudicial error was committed at the trial.

In the depositions of Dr. Gray and some of the other witnesses the opinion was expressed that the case was one of suicide, and the deposition of Dr. Gray not only expressed this opinion, but contains some cogent arguments in support of that opinion.

Opposing counsel have briefed the question of the admissibility of an expert opinion that the death in question resulted from wounds self-inflicted with suicidal intent, and there appears to be several authorities holding such testimony competent. *Miller* v. *State*, 9 Okla. Cr. 255, 131 Pac. 717, L. R. A. 1915A, 1088. We think, however, that the better rule excludes this expert testimony. This is the point in issue, the decisive fact in the case,

the question which the jury was impaneled to decide, and is an inference which one person might draw as well as another. Of course, the trained physician and surgeon might know the depth and character and consequences of cuts and wounds and the manner in which they might have been inflicted, which the lay witness might not have, and testimony of this character may be given by the expert, but, when it has been given, the jury, and not the witness, should say with what intent the wounds were inflicted.

It was therefore error to permit witnesses to express the opinion that the deceased had committed suicide, and, as we have said that the undisputed testimony does not show death by suicide, we must hold this incompetent testimony prejudicial.

Complaint is made of several of the instructions; but we find no error prejudicial to appellant in this respect. The law of the subject has been declared in many opinions by this court, the most recent being that of *Home Life Insurance Company* v. *Miller, ante* p. 901. The instructions declared the law as favorable to appellant as she had the right to ask.

For the error in the admission of the incompetent opinion evidence the judgment must be reversed, and the cause will be remanded for a new trial.