Don H. McClellan v. James H. French

5-4776                                        439 S.W. 2d 813

Opinion Delivered April 21, 1969

*Howell, Price & Worsham* for appellant.

*Smith, Williams, Friday & Bowen* by *W. A. Eldredge, Jr.,* for appellee.

Conley Byrd, Justice.    Appellant Don H. McClellan appeals from a jury verdict finding that appellee Dr. James H. French was not guilty of malpractice in his treatment of McClellan's perirectal wound.    For re-

versal of the judgment, McClellan relies upon the following points:

1. *The Court erred in permitting Dr. Buchman to give his opinion as to whether Dr. French was guilty of malpractice.*

2. *The Court erred in permitting defendant to propound hypothetical questions based on assumed facts which were not in evidence.*

The record shows that McClellan suffered his perirectal wound at Lake Ouachita while skiing. He was taken by friends to a hospital in Hot Springs where he was referred to Dr. French. Dr. French observed the wound, cleansed it but did not suture it at that time. McClellan waited in Dr. French's waiting room for his friends who had returned to Lake Ouachita to pick up a boat and trailer. While waiting, McClellan began bleeding, the blood flowing down his leg and off the chair onto the floor. He was returned to Dr. French's operating table where his wound was again examined. This time Dr. French sutured the wound and placed McClellan in a Hot Springs hospital for observation. McClellan was released from the hospital the next day. He states that he was released in the afternoon. Dr. French contends that he was released during the morning. Subsequent to McClellan's release from the Hot Springs hospital, he was seen by Dr. Laurens sometime between 4:00 and 5:00 and placed in a Little Rock hospital. The allegations in the complaint were as follows:

"That said defendant did negligently and carelessly fail to apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the practice of medicine in the locality in which he practices or in a similar locality in diagnosing and treating him; that as a result of such negligence and carelessness on the part of the de-

fendant a piece of rotten, contaminated and jagged wood remained in plaintiff's peritoneal cavity causing peritonitis, infection and putrification, requiring an exploratory laparotomy as well as a colostomy, causing great conscious pain and suffering and permanent partial disability.''

POINT 1. One of the pivotal issues concerning the alleged malpractice of Dr. French was whether he should have packed the would open to permit drainage as testified to by Dr. Laurens or whether it should have been sutured as testified to by Dr. French. To support his position that that was the standard medical procedure, Dr. French called Dr. Joseph Buchman who testified as follows:

Q. Is bleeding dangerous to the patient?

A. Certainly is.

Q. Should be controlled?

A. It has to be controlled.

Q. Then I take it, doctor, in your opinion Dr. French was not guilty of malpractice in suturing?

MR. PRICE:

Your Honor, this is a question ...

THE COURT: ...

THE WITNESS:

A. That is standard medical procedure in this community to suture a bleeding wound.

Q. In your opinion Dr. French was not guilty of malpractice in suturing this wound?

A. He was not.

McClellan argues that Dr. Buchman should not have been permitted to testify as to whether it was "malpractice" since this was the ultimate question for the jury. He cites as authority *Johnston* v. *Order of United Commercial Travelers*, 182 Ark. 964, 33 S.W. 2d 375 (1930). During oral argument counsel cited other authorities such as *Hoener* v. *Koch*, 84 Ill. 408 (1877).

In the *Johnston* case the issue was whether Sam C. Johnston had committed suicide. In holding that it was prejudicial error for a doctor to express an opinion that Johnston died as a result of suicide, we said:

> "Opposing counsel have briefed the question of the admissibility of an expert opinion that the death in question resulted from wounds self-inflicted with suicidal intent, and there appears to be several authorities holding such testimony competent. *Miller* v. *State*, 9 Okla. Cr. 255, 131 Pac. 717, L.R.A. 1915A, 1088. We think, however, that the better rule excludes this expert testimony. This is the point in issue, the decisive fact in the case, the question which the jury was impaneled to decide, and is an inference which one person might draw as well as another. Of course, the trained physician and surgeon might know the depth and character and consequences of cuts and wounds and the manner in which they might have been inflicted, which the lay witness might not have, and testimony of this character may be given by the expert, but, when it has been given, the jury, and not the witness, should say with what intent the wounds were inflicted."

In the *Hoener* case, the Supreme Court of Illinois held that it was proper for an expert to give his opinion as to whether or not the treatment the plaintiff received was proper, but that it was error for him to give his opinion as to whether, from all the evidence in the case, the doctor was guilty of malpractice.

However, in the case of *Dorr, Gray & Johnston* v. *Headstream*, 173 Ark. 1104, 295 S.W. 16 (1927), we said:

"Appellant's next contention for a reversal of the judgment is that the trial court erred in allowing appellee's witnesses, Doctors Ruff and Hill, to state that certain alleged facts constituted negligence on the part of appellants. They were permitted to testify that it would be negligence for an X-ray technician or practitioner to turn an X-ray of 4 milliamperes voltage on a patient for twenty or thirty minutes while absent from the room. The purpose for introducing expert testimony is to get the judgment or conclusion of the witness based upon facts assumed to be true. Expert witnesses could not answer a hypothetical question otherwise than by expressing an opinion or announcing a conclusion. We can see no difference in saying that certain acts or omissions constitute negligence in the treatment of a disease and saying that the acts hypothetically detailed show improper treatment. The court did not err in letting the two expert witnesses testify that, in their opinion, it constituted negligence for appellant to turn an X-ray on appellee of the voltage described for twenty or thirty minutes during the absence of the operator of the machine from the room. This court stated in the case of *Durfee* v. *Dorr*, 131 Ark. 376, 190 S.W. 376:

" 'Objection is made by appellant also to the action of the court in permitting practicing physicians, who qualified as experts, to testify as to the character of attention a patient should receive in a hospital. We think this evidence was competent, as it related to a subject upon which the average juror would have no information or experience upon which he would be in position to formulate an intelligent conclusion unless he based his conclusion upon the opinion of one qualified to speak as an expert.' "

We find nothing in the *Johnston* case contrary to our holding in the *Headstream* case. The difference between the two cases is this—in determining whether one committed suicide there is involved an element of intent, usually a matter of inference from the testimony which one person is as qualified to draw as another. On the other hand, in a malpractice case the testimony ordinarily relates to a subject upon which the average juror would have no information or experience and upon which he would not be in a position to formulate an intelligent conclusion unless he does it upon the testimony of one qualified to speak on the subject.

Since Dr. Buchman's answer to the question of whether Dr. French was guilty of malpractice shows that Dr. Buchman used and understood the word malpractice in its connotation of "standard medical procedure in the community",[1] we find no error in the use of the term malpractice.

POINT 2. ASSUMED FACTS. One of the controversial issues in the trial of this case was the time when McClellan was discharged from the Hot Springs hospital—*i.e.*, whether in the morning or in the afternoon. In contending that the trial court erred in permitting Dr. French to propound hypothetical questions based on assumed facts which were not in evidence, appellant relies upon the following proceedings:

Q. How do you tell when a foreign object sets up an infection, doctor?

A. You simply have to watch the patient and see what happens.

Q. And this takes time?

A. Times time; yes, sir.

---

[1] The propriety of limiting medical standards to a particular community is not an issue in this case.

Q. This doesn't happen in a matter overnight or a few hours?

A. No, sir.

Q. All right, Dr. Buchman, assuming these same facts to be true as already asked you, let's add the further, the further facts. I want you to assume in addition, doctor, that Mr. McClellan was not toxic nor did his wound reveal any evidence of infection at the time of his discharge from the hospital in Hot Springs. Assuming that he was discharged sometime during the morning of the day after his admission to the hospital at Hot Springs, I want you to further assume that a surgeon in Little Rock examined Mr. McClellan at around 4:00 to 5:00 o'clock that afternoon and that in this surgeon's opinion Mr. McClellan was toxic, and that his wound did reveal clinical evidence of infection at the time of the examination here in Little Rock. Now, doctor, assuming all of these facts to be true, do you have an opinion as to how quickly a patient may become toxic, his symptoms may reveal he is toxic?

MR. HOWELL: Now ...

MR. ELDREDGE:

Q. I am not through, and how quickly a wound may reveal clinical evidence of infection from that point where it did not reveal clinical evidence of infection, just answer my question yes or no to give Mr. Howell a chance to make an objection, if you have an opinion.

A. Yes, I do.

MR. HOWELL:

Your Honor...

THE COURT:...

MR. ELDREDGE:

Thank you, your Honor.

Q. Now, let's see, doctor where were we. I asked you whether or not based on those assumed facts which have already been shown, or will be shown in evidence, whether or not...

THE COURT:

...May I interrupt you just once more, Mr. Eldredge, and I am not clear and I am certainly not trying to suggest to the jury what the facts are, it seems to me that you gentlemen by referring to some record that you have in—before you, could determine whether or not your question as to the patient's discharge at Hot Springs was in the morning or afternoon. That could be clarified.

MR. ELDREDGE:

Your Honor, please, the test would be when Dr. French last examined the patient and assume, *the assumed fact was he examined him in the morning* before his discharge.

If it wasn't I meant for it to be. *I will amend my question.* [Emphasis ours].

THE COURT:

All right.

MR. ELDREDGE:

Q. All right, doctor, here we go. Do you have an opinion as to how quickly a patient can be examined and be non-toxic to being examined and being toxic; can be examined as far as his wound is concerned and have no clinical evidence of infection and being examined and have clinical evidence of infection?

A. Well, that can all take place in a matter of hours, three, four, five, something like that; depends entirely on the bacteria and upon the post of the patient and some bacteria grows much faster. You will have to remember that bacteria for the body multiplies 2, 4, 6, 8, 10. I mean 2, 4, 8, 16 and 32. That's the way they divide and they multiply very rapidly, if they are in any real good environment.''

Appellant contends that Dr. Buchman was erroneously permitted to assume that plaintiff was discharged in the morning and that the discharge of appellant from the hospital in the morning was not sustained by the record. We need not decide whether there is any evidence in the record to support the assumed fact that appellant was discharged from the hospital in the morning because as we read the record that assumed fact was changed to have the doctor assume that the man was examined by Dr. French in the morning. After the correction there was no further objection by appellant. In *Wheeler, Adm'x.* v. *Delco Ben,* 237 Ark. 55, 371 S.W. 2d 130 (1963), we said:

''While appellee's counsel was propounding the hypothetical question appellant's counsel objected, stating: 'Mr. Lindsey says there is no evidence of contusion to the chest area and I beg to differ there is evidence.' Thereupon appellee's counsel stated: 'Let me rephrase that and eliminate that ...' Since

no objection was made to the hypothetical question when rephrased, we find no merit in this contention. We cannot consider an objection to a hypothetical question when raised for the first time on appeal.."

For the reasons indicated we find the judgment must be affirmed.

JONES, J., dissents.

J. FRED JONES, Justice.    I do not agree with the majority in this case.    In the days when strychnine poisoning was diagnosed as "locked bowels" and treated by administration of additional strychnine in some localities, (*Sneed* v. *State,* 159 Ark. 65, 255 S.W. 895), perhaps medical doctors in a malpractice case were properly held only to that degree of skill and learning ordinarily possessed and used by members of the profession in good standing engaged in the practice of medicine in that locality.    In those days of patent medicines and home remedies; when bleeding was stopped by witchcraft or the application of soot and cobweb, perhaps a medical expert was the only one competent to say what was, and what was not, medical malpractice.

It is my opinion in this day of nationwide Blue Cross-Blue Shield, Medicare and sterile hospitals, and in this day of medical specialization and long internships, and closed circuit television, the same degree of skill and learning should apply in *all localities* and negligence in medical malpractice cases should in nowise be measured by the medical practice in the particular community where the doctor practices.    In this enlightened age, when the importance of sanitation is a matter of common knowledge and the results of contamination in a closed or open wound are well known, it should not require the conclusion of a medical expert for a jury to determine whether a particular procedure in probing, cleansing, disinfecting, suturing and treating a wound, constitutes malpractice.

738

Dr. Buchman was permitted to testify that Dr. French was not guilty of malpractice in suturing *this* wound. (Emphasis supplied.) Under the majority opinion, a jury was not necessary in this case at all. Dr. Buchman was permitted to give the answer the jury was empaneled to find. If Dr. Buchman had found malpractice, a jury would have only been necessary in fixing damage, if any.

The evidence is undisputed that the appellant sustained a deep and severe puncture wound by falling or sinking down onto a sharp underwater object. The evidence is undisputed that the wound was more than a finger length in depth and actually extended into the peritoneal cavity. The evidence is undisputed that upon a second examination of the wound by Dr. French, the wound was closed with sutures sufficient to stop bleeding, and although the appellant was hospitalized by Dr. French, the full depth of the wound was never probed or ascertained and a half inch piece of wood was left deep within the wound. If we can logically assume that Dr. French obtained a history of how and where the injury occurred, then common sense would dictate the probability that the offending instrument was a highly contaminated wooden object, and that a residue from that object would be left in the wound.

It is my opinion that it was for the jury to say, under proper instructions, whether the suturing of *this* wound constituted malpractice under all of the evidence in this case. I would reverse and remand for a new trial.